BONBRIGHT et al. v. GEARY et al., Corporation Commission of Arizona et al.

KELLEY v. SAME.

(District Court, D. Arizona. November 19, 1913.)

Nos. E-9 and E-10.

1. GAS (§ 14*)—GAS COMPANIES—STATE REGULATION OF RATES—CONFISCATORY RATES.

A state commission having power to fix rates to be charged by a public service corporation, as a gas or electric company, must make the rates sufficiently high to yield a fair return on the reasonable value of the property at the time it is being used for the public.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

2. GAS (§ 14*)—GAS COMPANIES—REGULATION OF RATES—VALUATION OF PROPERTY.

If the valuation of any one of the necessary elements of a public service plant is fixed by the rate-making authorities at a sum unjustly and unreasonably low in a substantial amount, or if the value of an element of substantial value used or useful in maintaining or operating such a plant is entirely omitted by the rate-fixing authority and rates are based on the valuation so made, such unreasonable and unjust valuation or omission of valuation is the taking of private property for a public use without just compensation.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

3. GAS (§ 14*)—GAS COMPANIES—RATES FIXED BY PUBLIC AUTHORITY—VALUATION OF PROPERTY.

Evidence considered, and *held* to make a sufficient showing to entitle the stockholders and bondholders of a gas and electric company to a preliminary injunction to restrain the enforcement of rates fixed by the Corporation Commission of Arizona to be charged by the company on the ground that in making a valuation of its property as a basis for such rates the commission omitted certain elements of substantial value which the company was entitled to have included in the valuation, and that the valuation as a whole appeared to be unreasonably low, being less than the

amount complainants paid in the open market for the company's stock less than a year before, on a valuation by competent experts, although the property was subject to a mortgage of $700,000.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

4. GAS (§ 14*)—GAS COMPANIES—REGULATION OF RATES—"OVERHEAD CHARGES."

"Overhead charges" is a term which, as applied to a public service corporation, includes the expense that would necessarily be incurred in the reproduction of the property; the legal expenses of organization and expenses for office, engineering, inspection, supervision, and management during construction; fire and casualty insurance, taxes and interest during the period, contractors' profits, and other minor expenses of like character.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

In Equity. Suits by William P. Bonbright, Irving W. Bonbright, Frederic C. Walcott, Orlando B. Willcox, Starling W. Childs, Frederick W. Stehr, George Rex Buckman, William P. Fisher, Lord Fairfax, and George C. Cassels, doing business as copartners under the firm name of William P. Bonbright & Co., against W. P. Geary, Amos W. Cole, and Frank A. Jones, members of the Corporation Commission of the State of Arizona, George P. Bullard, Attorney General of the State of Arizona, Frank H. Lyman, County Attorney of Maricopa County, Ariz., George C. Adams, Charles H. Akers, Henry L. George, Ernest W. Lewis, and the Pacific Gas & Electric Company, defendants, and by Augustus W. Kelley, as trustee, against the same defendants, to restrain the enforcement of certain gas and electric light rates prescribed by the Corporation Commission of Arizona. On motions for interlocutory injunctions. Motions granted.

Louis H. Chalmers and Edward Kent, both of Phœnix, Ariz., and H. Alexander Smith, Daniel W. Knowlton, and George B. Hatch, all of Colorado Springs, Colo., for complainants.

G. P. Bullard, of Phœnix, Ariz., for defendants.

Before MORROW, Circuit Judge, and VAN FLEET and SAWTELLE, District Judges, convened under the provisions of section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]).

MORROW, Circuit Judge (orally). In disposing of these cases this morning we will state our conclusions in a general way. We have not had time to prepare a written opinion, and perhaps our general conclusions will be sufficient for the present purpose.

The first-entitled suit is by the stockholders of the Pacific Gas & Electric Company, a public service corporation organized to supply gas and electricity to the inhabitants of the city of Phœnix in the state of Arizona.

The second suit is by the bondholders of the same corporation. The defendants in these two cases are members of the Corporation Commission of the state of Arizona, the Attorney General of the state of Arizona, the district attorney of Maricopa county (the county in which the plant of the Pacific Gas & Electric Company is situated); certain

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

customers of the Pacific Gas & Electric Company, and the corporation itself. The suits are brought to restrain the Corporation Commission of the state of Arizona from compelling the Pacific Gas & Electric Company to adopt and put in operation a certain schedule of rates promulgated by the Corporation Commission; that is to say, a schedule of rates to be charged for gas and electricity supplied to its customers by the Pacific Gas & Electric Company. The suits are brought by the stockholders and bondholders of the Pacific Gas & Electric Company against the named defendants for the reason, among others, that under the law of the state of Arizona the penalties which would attach for noncompliance with the order of the Corporation Commission are so excessive and extreme that the officers of the company have refused to take the risk of disregarding them, and the responsibility of testing the validity of the rates fixed by the Corporation Commission is left to the action of the stockholders and bondholders of the company. The allegations of the two bills of complaint are substantially the same, and the two cases will be treated and referred to as one case.

The jurisdiction of the federal court is invoked on the grounds of diversity of citizenship arising out of the fact that all the stockholders in the first case and all the bondholders in the second case are citizens and residents of states other than that of Arizona, and the defendants are all citizens and residents of the state of Arizona. Second, the jurisdiction of the federal court is also invoked upon the constitutional grounds that the statute of Arizona in question denies to complainants the equal protection of the laws and threatens to deprive them of their property without due process of law. This claim of jurisdiction is based upon the allegations of the complaint setting forth in substance that in no other way can the rights of the complainant be adjudicated and determined in a court of law; that the pains and penalties of the Arizona statute are so severe and cumulative in effect that neither the complainants nor the company can under the provisions of the statute test the validity of the order of the Corporation Commission here involved without the danger of being subject to irreparable damage and absolute ruin. These allegations of the complaint and the provisions of the Arizona statute to which reference is made appear to bring this case within the decision of the Supreme Court of the United States in Ex parte Young, 209 U. S. 123–144, 148, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; but, as the jurisdiction of this court is otherwise complete, we will not stop to discuss that feature of the case. We will come at once to the merits of the controversy.

In approaching this subject we wish to say that we recognize fully the authority and the wisdom of the views of the Supreme Court of the United States in Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, and in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, wherein it was held that a case should be a clear one before the court ought to be asked to interfere with state legislation upon the subject of rates in advance of an actual experience of the practical results of such rates; and, if this were a similar case to either of these cases, we should un-

hesitatingly remand these complainants to an actual experience of the practical results of the prescribed rates; but we do not consider that the facts in the present case bring it within that rule. There are several reasons why we are of that opinion, but there is one statement of the court in the Knoxville Case which sufficiently distinguishes that case from the present case. The statement will be found in 212 U. S. 18, 29 Sup. Ct. 154, 53 L. Ed. 371. The court says:

"City authorities (of Knoxville) acted in good faith, and they tried, without success, to obtain from the company a statement of its property, capitalization and earnings."

No such fact appears in this case. The gas and electric company appears to have acted with good faith in furnishing the Corporation Commission with full and detailed information as to its property, its capitalization, and its earnings. It is not charged that the company has withheld any information desired by the Corporation Commission, or that the company has in any way prevented a free and full examination into all of its affairs; in other words, the Corporation Commission has had the benefit of the company's experience with existing rates, and it does not appear to be a difficult matter to estimate the practical result that would follow the rates ordered by the Corporation Commission. In fact, the estimate of the difference of the operation of the two rates is set forth in the record and is not a matter of substantial dispute.

In the Willcox Case the controversy was mainly with respect to the value of certain franchises granted by the city without cost and held by certain gas lighting companies in the city of New York as a gratuity. These corporations had been merged under a statute of the state into the Consolidated Gas Company. The suit was to enjoin the enforcement of certain legislative acts of the state and an order made by the Gas Commission, which subsequently became the Public Service Commission, relative to rates for gas in New York City. The ground for the relief asked for in the bill of complaint was the alleged unconstitutionality of the act and the order because the rates fixed were so low as to be confiscatory in effect. The consolidation of the stock of the various companies into the stock of the Consolidated Gas Company took place in 1884, at which time the tangible property of the several companies forming the Consolidated Company was appraised at $30,-000,000 and the several franchises transferred to the Consolidated Company at $7,781,000. The stock of the Consolidated Company included this valuation of the franchises. The question was: What was the valuation to be placed upon the property of the Consolidated Company in 1895 upon which it was entitled to a return equivalent to that obtained on investments of that degree of safety in the city of New York? The lower court found that the value of the tangible property of the corporation in 1884 was, as before stated, $30,000,000; that in 1895 its tangible property had increased in value to $47,000,000; that the value of the franchises had increased in like proportion and was of the value of $12,000,000, making a total valuation of $59,000,000, in round numbers. The valuation of the tangible property had been made by experts; the estimated increase in the value of the franchises

had been made and found by the trial court. It was upon this finding
that the court decreed the enactment to be unconstitutional with respect
to the rates fixed. With respect to this increased valuation of the fran-
chises the Supreme Court said:

"We are not prepared to hold with the court below as to the increased
value which it attributes to the franchises. It is not only too much a matter
of pure speculation, but we think it is also opposed to the principle upon which
such valuation should be made. This corporation is one of that class which is
subject to regulation by the Legislature in the matter of rates, provided they
are not made so low as to be confiscatory. The franchises granted the various
companies and held by complainant consisted in the right to open the streets of
the city and lay down mains and use them to supply gas, subject to the legis-
lative right to so regulate the price for the gas as to permit not more than a
fair return (regard being had to the risk of the business) upon the reasonable
value of the property at the time it is being used for the public."

After referring to the business of the company during the period.
from 1884 to 1895, the court was of the opinion that the increased
valuation of the franchises to $12,000,000 should not be allowed. The
opinion of the Supreme Court is by Mr. Justice Peckham. In the
margin of the report of the opinion is an announcement made by Mr.
Justice Peckham which contains the following statement:

"The estimated increase in the value of these franchises as made by the trial
court at the time of the commencement of this suit is only an estimate and is
not based upon evidence sufficient to warrant the finding of any increase what-
ever over the amount agreed upon at the consolidation."

In the present case there is no question concerning the valuation of
a franchise. The corporation makes no claim for the value of its fran-
chise, and no valuation is placed upon it in these proceedings. Upon
this question alone the case is to be widely distinguished from the Will-
cox Case. Furthermore, in that case, as in the Knoxville Case, no
question as to a temporary injunction was involved. That stage of
the proceedings had been passed in both cases, and the question was
as to the validity of rates determined upon final decree. The applica-
tion here is for a temporary injunction pending inquiry into the facts
of the case in accordance with a method of procedure fair both to the
public and to the public service corporation.

[1] We come now to the question of valuation, and we commence
the inquiry with this rule for our guide:

"There must be a fair return upon the reasonable value of the property at
the time it is being used for the public." San Diego Land & Town Co. v. Na-
tional City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 811 (43 L. Ed. 1154); Same v.
Jasper, 189 U. S. 439–442, 23 Sup. Ct. 571, 47 L. Ed. 892; Willcox v. Consoli-
dated Gas Co., 212 U. S. 19–21, 29 Sup. Ct. 148, 53 L. Ed. 371.

[2] The inquiry will also be aided by another rule, that if the val-
uation of any one of the necessary elements of the public service plant
is fixed by the rate-making authorities at an amount unjustly and un-
reasonably low in a substantial amount, or if the value of an element
of substantial value used and useful in maintaining or operating such
a plant is entirely omitted by the rate-fixing authority, such unreason-
able and unjust valuation or omission of valuation is the taking of
private property for a public use without just compensation.

[**3**] We will now proceed to consider the evidence before us on this motion. It appears that the complainant, in the month of August, 1912, acquired the property of the Pacific Gas & Electric Company by purchase for $557,500, in cash; such purchase being all of the outstanding stock of the company. That said company was then and now is subject to a lien of a certain trust securing outstanding bonds of the company amounting to $670,000. The total purchase price of the stock and the outstanding bonds, in August, 1912, amounted therefore to the sum of $1,227,500. This amount the complainant contends was the market value of the property at that time; it having purchased in the open market after diligent inquiry as to its value. It is alleged in the complaint, and there is evidence in the record sustaining the allegation, that the books of the company show that the company and its predecessor have laid out and expended in actual cash for construction and material used in the construction of the plant the sum of $937,563. This sum is claimed to be the actual cost of the plant. There has also been a valuation made by certain engineer experts for the company showing that the value of the property as of June 30, 1912, was $1,180,000; this valuation is designated as the cost of reproduction. The Corporation Commission of Arizona has also made a valuation of the property based upon expert evidence and has fixed the value of the plant at $511,234.69; and upon this latter valuation the Corporation Commission has fixed the schedule of rates which is the subject of complaint in this action. The complaint is that the valuation placed upon the property of the corporation by the Corporation Commission in unlawful, unjust, unreasonable, and confiscatory, and does not represent the true present value or the true, just, and fair valuation of the property of the corporation for the purpose of rate making or for any purpose whatever.

The plant of the Pacific Gas & Electric Company consists of two service systems, one an electricity producing and delivery plant, and the other a gas producing and delivery plant. The expert engineers on the part of complainant value the electric plant at the sum of $788,000 and the gas plant at $392,000, making a total of $1,180,000. The Corporation Commission has valued the electric plant at $318,902.73 and the gas plant at $192,331.96, making a total valuation as above stated of $511,234.69. This value of the property of the company by the Corporation Commission is $46,265.33 less than the amount paid by the complainant for the stock of the corporation alone; it is $158,-765.33 less than the outstanding bonds of the corporation alone, and is $716,265.13 less than both stock and bonds combined; it is $426,-328.33 less than the actual cash expended for the construction and for the material used in the plant as shown by the books of the company, and is $668,765.53 less than the estimated cost of reproduction as shown by complainants' experts. The Corporation Commission has fixed the rate of return which the plant should be allowed to earn upon the valuation of $511,234.69 at 8 per cent. per annum, and upon this valuation and return the Corporation Commission has fixed the rates that are to be charged to the customers of the company. There is complaint that the return of 8 per cent. per annum is too low in com-

parison with the returns realized on capital similarly invested in that locality. The claim is that the company should be allowed a return of 10 per cent. per annum upon the actual value of its plant. The substantial complaint at this time, and for the purpose of this motion, is that the valuation made by the Corporation Commission of the property of the company used and useful in the operation of its plant is unjustly and unreasonably low and does not allow a return upon the investment. That is the question to which we will now direct our attention.

The question at issue upon this motion turns therefore upon the present value of the plant. Should the valuation be $1,227,500, the amount of the outstanding bonds and the purchase cost of the stock of the corporation, that is to say, the market value, as claimed by the complainants; or should it be the appraised value of $1,180,000 made by the expert engineers on behalf of the complainant, which is claimed to be the reproduction value of the plant; or should it be the actual cost of the plant as shown by the books of the corporation, namely, $937,563; or should it be the value placed upon the plant by the Corporation Commission, namely, $511,234.69? There is here a wide difference in the valuations; so wide, indeed, that a satisfactory adjustment of the entire question is impossible at this time, and we will not attempt it. All that we can do now is to examine the differences on broad lines and ascertain in a general way whether the valuation placed upon the plant by the Corporation Commission is reasonable and just. For that purpose we will take the valuation made by the expert engineer Francis S. Viele as a basis for comparison. In this way we will develop the main differences between the two valuations. Mr. Viele states his qualifications as expert engineer very fully, as follows:

"I am a graduate of the Massachusetts Institute of Technology in the department of electrical engineering. I have had twenty years' experience in the construction and operation of electric properties of all kinds, and have of my own knowledge accurate information on costs. I was for ten years the head superintendent of construction for the Standard Underground Cable Company of Pittsburgh, and handled personally construction work in excess of $15,000,000. As assistant to the president of the General Electric Company for three years, I had charge of the investigation of electric properties, with reference to the cost, earning power, and proper price at which to value such property, and in this capacity investigated properties in every part of the United States, and on my advice many properties were financed. Since 1906, I have been president of the Electric Operating Construction Company of New York, and had active charge of the business of that company particularly with reference to the financing of the enterprises constructed and operated by the company."

He explains his valuation of $1,180,000 as follows:

"Said valuation of $1,180,000 is arrived at by me as follows: .
"Careful examination of all vouchers of this company for the last seven years was made by Lee & Plunkett, public accountants, employed by the commission at the hearing referred to in the bill of complaint herein, and a tabulation of the unit price of all material purchased during that time was made by them. From these figures are determined the average prices of all material for a period of five years past; these prices applied to the quantities of material in use by the company on June 30, 1912, thus showing the actual cost to reproduce the physical property, based on average prices for the last five years.

"The reproduction cost (new) of the physical property was depreciated to secure the present value of the physical property; the amount of depreciation being determined by actual inspection of all such apparatus as could be inspected at the present time. To such apparatus as could not be inspected, the ordinary accepted theoretical annual depreciation was applied.

"The results obtained are summarized as follows:

| | |
|---|---:|
| Present value of physical property in use June 30, 1912 | $ 563,034 00 |
| Overhead charges (actual) | 112,607 00 |
| Working capital | 50,000 00 |
| Proportionate value of power contract with United States government due to 7 years' unexpired term, which contract has yet to run | 110,000 00 |
| Accrued deficits based on a reasonable return on money invested since organization of company | 282,000 00 |
| Discount on bonds | 63,000 00 |
| Less, for round figures | 641 00 |
| | $1,180,000 00" |

Let us examine this valuation somewhat in detail as to units and compare it with the same units in the valuations made by the Corporation Commission. Mr. Viele fixes the present value of the physical property in use June 30, 1912, at $563,034. The Corporation Commission values the unit at $437,459.63; the difference being $125,570.37. Mr. Viele values the overhead charges at $127,607. The Corporation Commission values it at $50,276.06; the difference being $62,330.94. Mr. Viele values the working capital at $50,000. The Corporation Commission values this unit at $23,500. For the proportionate value of the power contract with the United States government, due to seven years' unexpired term, Mr. Viele places the value at $110,000. No valuation whatever is made by the Corporation Commission for this unit. For the item designated in the appraisement as accrued deficits based on a reasonable return on the money invested since organization of the company, Mr. Viele places the value at $282,000. This item is explained as the value of the company as a going concern. No valuation of this item is made by the Corporation Commission. For discount of $63,000 on the bonds no allowance is made by the Corporation Commission. There is another item not mentioned in Mr. Viele's appraisement which should be considered, and that is a reserve fund of $64,292.97 on hand in the treasury of the company, having been acquired as a reserve fund for the purpose of keeping the plant in repair. This item is not allowed by the Corporation Commission.

Returning now to the difference in the present physical valuation of the plant, we find it is made up chiefly of the amount estimated for depreciation. An estimate for depreciation is, of course, correct. The question is as to the amount which should be allowed for depreciation. The Corporation Commission estimated the value of the various physical units, and then estimated that the plant had depreciated at the rate of 7 per cent. per annum, which for an average of, say, seven years, would be 49 per cent. for the total depreciation upon the whole plant, leaving the present value of the plant only 51 per cent. of its original value. The experts for the complainant made an examination of the various units of the physical properties and as far as possible made an

actual valuation of each unit, and when that was not possible then an estimated depreciation was made.

Turning now to the affidavit of R. S. Masson, an expert engineer, and one of the experts who valued the plant for the company, we find the following uncontradicted statement concerning the plant:

"Condition of Property. The gas and electric plants of Pacific Gas & Electric Company are in good and efficient condition. All parts of the electric generating plant are modern, up-to-date installations, including turbo-generators, water tube boilers, condensers, oil and lamp black burning apparatus, etc. There is an ample water supply obtained from wells. The new gas generating plant is a modern, up-to-date reversible Lowe water gas apparatus. Both plants are housed in brick buildings with steel truss roofs covered with fireproof material. Neither plant could be improved upon anywhere. The electric distributing system is the most modern type for distribution in cities of this character, and all the lines, transformers, and service equipment are of the latest, most improved type. The gas distributing system includes ample mains well laid, the greater portion of which have been installed during the last three years. This distributing system is in the best possible condition and of the most up-to-date qualifications. The utility equipment of the company is also of the latest design, including automobile trucks and the latest office labor-saving devices."

It would seem that, if the plant is in the condition set forth in this statement, a deduction of 49 per cent. from its original value for depreciation, or approximately that percentage, is excessive; but to what extent it is excessive we do not now determine. We call attention to the statement for the purpose of referring to the fact that the plant appears to have been kept in repair and is now in good condition. In the Knoxville Case the Supreme Court commended this method of preserving the integrity of a public service plant. The court said:

"Before coming to the question of profit at all, the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public."

This brings us to a peculiar feature of this case. There was on hand in the treasury of the company at the time of the valuation of the plant the sum of $64,292.67, accumulated for the purpose of meeting the expense of current repairs and for replacing such parts of the property as had been worn-out and the life of the part ended. The fund had been withheld from the stockholders that it might be used in preserving the plant in good condition and in proper efficiency. This was good business judgment on the part of the officers of the corporation and must be approved. Public service corporations are to be encouraged in maintaining their plants in a proper state of efficiency. We are of the opinion that the Corporation Commission was in error in its estimate of depreciation of this plant, and particularly was in error in omitting this reserve fund from its valuation of the plant.

There is another feature of the case which appeals to us for con-

sideration, and that is the valuation of the contract with the federal government for power. The company values the remaining term of this contract at $110,000; the Corporation Commission omitted it altogether. It appears that the Reclamation Service, proceeding under the provisions of the Act of Congress of June 17, 1902, c. 1093, 32 Stat. 388 (U. S. Comp. St. Supp. 1911, p. 662), formed a project for impounding the waters of Salt river at a point about 75 miles from Phœnix with a structure called the Roosevelt Dam. The project contemplated the distribution of water for irrigation of about 200,000 acres of land near Phœnix and for supplying electric light and power to the inhabitants of the same territory. The Reclamation Service found the predecessor of the present company in possession of certain water rights and a plant with which it was supplying electricity to the inhabitants of Phœnix. The plant cost originally $189,000, and in these proceedings it is designated as the Desert Plant. When the government came to establish its project on Salt river, it was deemed necessary to acquire this Desert Plant, together with the water rights of the complainant's predecessor, and negotiations were accordingly opened with the company with that object in view. The negotiations resulted in a contract under which the Desert Plant, together with the water rights, were secured, and in consideration thereof the Reclamation Service agreed to deliver to the company electricity at the rate of 1½ cents per kilowatt for the term of ten years. This contract was submitted to the Secretary of the Interior and the Attorney General of the United States, at Washington, and was approved by them and agreed to by all parties in interest. The acting Attorney General in his letter of approval has this to say about this contract:

"As recited in the contract itself, and as shown by the records of this department, the Pacific Gas & Electric Company was the owner of certain water rights in canals within the physical limits of the reclamation project, and, pursuant to the policy of merging all irrigating canals in Salt River Valley in the government reclamation project, so that when completed and paid for the water users would control all irrigation works therein, it was deemed necessary to acquire the rights of the electric company. Such an adjustment was reached through the contract in question wherein the electric company surrendered and conveyed to the United States all of its rights, and in lieu thereof the United States agreed to furnish to the company in the city of Phœnix, Ariz., a specified amount of electrical energy generated at works of the United States of the Roosevelt Reservoir. For this energy the company obligates itself to pay 1½ cents per kilowatt hour for all power furnished and consumed, the receipts therefor being credited to the Salt river project, thereby operating to reduce the charges payable by the landowners and irrigators therein. The contract was for a term not exceeding 10 years."

Under this contract the present corporation is receiving electricity from the Reclamation Service which it supplies to its customers; it takes the place of a plant which cost $189,000. The contract went into effect in 1909 or 1910 and has six or seven years to run. The value of the remaining term is estimated by the complainant at the sum of $110,000. We are of opinion that this contract has a substantial value for the company, but what that value is we do not now determine. We think the Corporation Commission should have given this contract a reasonable valuation in view of all the circumstances of the case, and

that the omission to make such valuation was a substantial error in the proceedings.

We come next to the valuation of what is termed the working capital. The experts for the complainant value this item at $50,000. The Corporation Commission valued it at $23,500. We think the latter sum is too small for the current business of the corporation. The corporation must carry a certain amount of supplies and should pay its bills for repairs and supplies at the end of the week or month as they come due and should not be obliged to await the collection of its revenues from the rates collected by the company from its customers. There is always more or less delay in collecting rates. The company should therefore have constantly on hand what might be termed a revolving fund to pay its own current obligations and keep its credit good and enable it to transact its business promptly and satisfactorily to everybody concerned. We think that a working capital of $50,000 is a reasonable capital for the corporation in this case and should be allowed as a valuation in its plant.

[4] There is also a question as to the item of overhead charges. This item is not very clearly defined, but appears to include the expenses that would necessarily be incurred in the reproduction of the property. It includes the legal expenses of organization and the expenses for office, engineering, inspection, supervision, and management during the period of construction; it would also include fire and casualty insurance, taxes, and interest during the period, contractors' profits, and other minor expenses of like character. The complainant's experts estimated this valuation at 20 per cent. on the physical valuation of the material and cost of construction entering into the plant; the Corporation Commission has estimated it at 12 per cent. of the physical valuation of the materials and cost of construction as they have estimated these elements. Complainant's criticism of this estimate is that it is too low and does not include all the expenses that necessarily enter into the reproduction of such plant. We think this estimate needs further consideration and probable revision in a final valuation of this item.

With respect to the item of accrued deficits based upon a reasonable return on the money invested since the organization of the company, estimated by the experts at $280,000, and for which no allowance was made by the Corporation Commission, we have not had time to examine the evidence with respect to this item. As has been stated, this is the valuation of a going concern as distinguished from the bare bones of the corporation. The courts recognize a difference between the value of a plant of this character, without customers or business, and a plant that has been fully established and connected up with a municipal lighting system and with the houses, business places, and factories of regular customers. The present corporation was in August of last year a going concern; it was connected up with the municipal lighting system, the houses, business places, factories, and other institutions of a prosperous community, and there was nothing more to do except to deliver the service, for which the corporation was fully and efficiently equipped. We think this element of valuation should be

considered in connection with the other elements of valuation with the view of determining the actual present value of the whole plant.

We think, for the reasons stated, we are justified in awarding an interlocutory injunction. The differences to which we have referred between the valuation of the plant of this corporation as made by the Corporation Commission and the experts for the company are so great that we think the subject is one for judicial investigation. In the meantime the status quo should be maintained. In making this order, however, we must take into consideration the possibility that upon a careful consideration of all the facts in the case the court may reach the conclusion that the findings and orders of the Corporation Commission are substantially correct, and for that contingency we must require security that will fully protect the customers of the company in their rates. This is an embarrassing and a difficult problem to deal with. Both my Brother VAN FLEET and myself have had trouble in other cases in dealing with the fund arising out of the difference between the lower and the higher rates in these controversies. We have come to the conclusion, however, that the order we will make in this case will dispose of that question effectively and secure substantial justice to all concerned. It appears from the evidence that the difference between the amount received by the company from its present rates and the amount that would probably be received under the rates fixed by the Corporation Commission would be about $3,000 per month, or $36,000 per year. A final decree may not be reached in this case inside of a year. I am sure the case will not be delayed by the court in Arizona, but delays are unavoidable from various causes, and we should provide for a safe margin. We are of the opinion therefore that a temporary injunction should issue upon complainants giving a bond in the sum of $50,000. We are of the opinion further that this order should provide that the company shall file with the clerk of the court, conveniently after the first day of each month, a statement of the amount collected from each of its customers, together with a statement of the amount that would have been collected had the rates of the Corporation Commission been in force, and that when a final decree is entered, if it shall be determined that the rates of the Corporation Commission should have been adopted by the company, then and in that event the difference between these rates and the rates collected shall be paid to an officer of the court— a special master—and be distributed by the special master to the various persons entitled to receive the same. We will provide further that the amounts paid to the master by virtue of the final decree shall carry interest at the rate of 6 per cent. per annum for the term during which the company had the use of the money. It is not the order that the company shall pay any money into court until the final decree is entered, and then only if the final decree adjudges that the rates prescribed by the Corporation Commission are valid rates; in that event the company will pay the excess collected to the special master, together with interest at the rate of 6 per cent. per annum from the day the excess was collected. These amounts are to be paid within a time

to be fixed by the decree. The bond herein provided for may be given within 15 days from date.

Mr. Bullard: There is one matter that I would like to have understood: The question to be determined is not whether the rate is a proper rate as fixed by the Corporation Commission, but whether it is a confiscatory rate.

Judge MORROW: Oh yes, that is the question: Is the rate confiscatory in the sense in which that term is defined by law?

Judge SAWTELLE: And the bond must be satisfactory in form to the defendants' counsel.

Judge MORROW: Yes.

Mr. Kent: May I make just one suggestion, your honor? Is the bond to be given by the stockholders, that the company will carry out these matters?

Judge MORROW: The bond will only be required to be given in one case; the company can give it, or the stockholders can give it.

Mr. Bullard: Cannot an order be made by his honor Judge SAW-TELLE consolidating these cases for all purposes? I do not see any reason why they should not be consolidated.

Judge VAN FLEET: I think they should be consolidated and treated as one case.

Judge SAWTELLE: Make an order to that effect, Mr. Clerk, consolidating the two cases.

Mr. Kent: Would it be within your honors' purview that if the Attorney General and myself and Judge SAWTELLE agree upon it, that the bond be given by the company instead of by the stockholders, if that turns out to be the most feasible plan?

Judge MORROW: That will be satisfactory to us. You can insert the conditions of the bond in such a way as will be entirely satisfactory to you all.

Mr. Bullard: There is one thing I want to be clear about, your honor, as it will be of importance for the Corporation Commission to understand it clearly. In speaking of this question of going value, did you intend to approve of the theory of going value to the amount specified by the experts for the complainant?

Judge MORROW: No. What we hold is that some amount should be allowed. On that element I have frequently been confronted with the question of the value of a going concern, and I have never yet been able to determine such valuation upon the evidence submitted, and we are not able to make it now in this case. We simply say it appears to have a value and the subject should be considered by the court.

Judge VAN FLEET. All that we are agreed upon here is that upon principle there should be a greater value attachable to a going concern than one which is merely in its initiative and not enjoying the benefit of patronage.