## DULUTH ST. RY. CO. v. RAILROAD AND WAREHOUSE COMMISSION OF MINNESOTA et al. (CITY OF DULUTH, Intervener).

(District Court, D. Minnesota, Third Division. December 27, 1924.)

**1. Carriers ⊂⊃18(6)—Statutory provision for appeal from rate-making commission to state court held not to preclude suit for injunction in federal court.**

An order of the Railroad and Warehouse Commission fixing street railway fares ends the legislative function of rate making, and the hearing provided by Laws Minn. 1921, c. 278, § 10, is not a continuation of the legislative rate-making process, nor does the remedy provided by such statute preclude resort to the federal courts.

**2. Carriers ⊂⊃18(6)—Test period of rates held not prerequisite to suit for injunction restraining enforcement of rates.**

A suit to enjoin an order fixing street railroad fares is not premature because no test period had intervened since the order fixing the fares.

**3. Carriers ⊂⊃12(1)—Power of Railroad and Warehouse Commission to fix rates complete, except that rates must not be confiscatory.**

Under Laws Minn. 1921, c. 278, §§ 6, 9, regulating the fares of street railway company,

the Railroad and Warehouse Commission has complete authority to fix rates so long as not confiscatory under the Fourteenth Amendment or in excess of the maximum fixed by the act.

**4. Carriers ⟠18(6)—Neither court nor special master concerned in fixing rates except to determine whether rates are confiscatory.**

Neither the court nor the special master in suit to enjoin order of Railroad and Warehouse Commission fixing street car fares can fix rates, their function being to determine whether the rates fixed by the legislative authorities are confiscatory or take private property without due process.

**5. Carriers ⟠12(5)—Power contract to be considered in fixing rates.**

An advantageous contract for the furnishing of electric power is a thing of value to be considered in the fixing of rates.

**6. Carriers ⟠12(5)—Federal income tax considered as "operating expense" in rate making.**

In computing the valuation of a street railroad for the purpose of rate making, the federal income tax should be included in "operating expenses."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Operating Expenses.]

**7. Carriers ⟠12(5) — Litigation expenses chargeable as "operating expenses" when authorized by statute.**

In fixing the rates to be charged by a public utility, an amortized allowance for expenses of litigation may be considered as operating expenses in view of Laws Minn. 1921, c. 278.

**8. Carriers ⟠12(5)—Six-cent fare held required, notwithstanding Commission's order fixing lower rate.**

Street railway fares fixed by Commission *held* inadequate, and street railway company entitled to charge six-cent fare.

In Equity. Suit for injunction by the Duluth Street Railway Company against the Railroad and Warehouse Commission of the State of Minnesota and others, to enjoin the enforcement of an order fixing rate of fare, in which the City of Duluth intervened. On exceptions to the special master's report. Exceptions overruled in part and sustained in part.

The findings of Thomas D. O'Brien, special master, were as follows:

"I. The plaintiff, a duly incorporated street railway company, for many years prior to 1921 operated connecting street railway systems in the cities of Duluth, Minn., and Superior, Wis., holding in Duluth the franchises described in the complaint. Defendant Clifford L. Hilton is the Attorney General, and the defendants O. P. B. Jacobson, Ivan Bowen, and Frank W. Matson are the members of the Railroad and Warehouse Commission of Minnesota. The intervener,

the city of Duluth, is a municipal corporation.

"II. On April 14, 1921, there was duly approved chapter 278, General Laws of Minnesota 1921, and shortly thereafter the plaintiff elected to comply with and come under the terms and provisions of that statute as to its railway in Duluth, by filing the declaration and consent set forth in the complaint, and thereupon obtained an indeterminate permit to operate and conduct its street railways in the city of Duluth subject to the terms and conditions and with the duties, rights, and privileges set forth, granted and declared by said chapter 278, Laws 1921. At the date of the enactment of chapter 278, Laws 1921, and at the time of said election, the rate of fare existing in Duluth was 5 cents per passenger.

"III. Thereafter, the plaintiff duly applied to said Railway and Warehouse Commission, pursuant to the provisions of said chapter 278, Laws 1921, that the Commission determine the value of the property of the plaintiff devoted to said street car service in Duluth and the rates and fares to be charged by plaintiff.

"IV. Due notice of said application was given to all persons interested, the city of Duluth was made a party to the proceeding, a full hearing was given by the Commission and testimony received, and after due hearing and consideration the Railroad and Warehouse Commission on July 13, 1922, made and filed its determination and order, to be effective August 1, 1922, wherein it was found and determined that the value of plaintiff's property used and useful in said street car service in Duluth on December 31, 1921, was $4,599,978.22, upon which amount the plaintiff was entitled to an annual net return of 7½ per cent., and to enable the plaintiff to secure the same it was "authorized to charge for its service in the transportation of passengers within the city of Duluth six (6) cents cash fare," and should "issue tickets or tokens good for rides on its said lines within the city of Duluth and charge therefor not to exceed twenty-five (25) cents for five (5) rides."

"V. The fair value on December 31, 1921, of plaintiff's property used and useful in the street car service in the city of Duluth was $4,599,978.22, and the plaintiff was, at the date of the Commission's order, and now is, entitled to rates of fare which would, after paying operating expenses and federal and state taxes, yield a net annual return to plaintiff upon that value of 7½ per cent., or $345,000.

"VI. Between December 31, 1921, and July 31, 1923, plaintiff has added to said system in Duluth property of the value of $189,953, which is not included in the value above found, nor is that additional property taken into consideration hereafter in these findings.

"VII. The total number of passengers carried by plaintiff during the year ending July 31, 1923, was 25,384,100, and had the rates ordered by the Commission been in effect, the number of passengers carried would not have exceeded 26,114,100, from whom the plaintiff, under the rates ordered by the Commission, would have received no more than 5⅓ cents per passenger, or an aggregate of $1,392,752, but from the fares actually charged and collected during said year, namely, 6 cents per passenger, the plaintiff received as—

Gross operating revenue.......$1,523,046.00
Nonoperating and other revenue..   15,202.62
                                   _____
    Total revenue..............$1,538,248.62

"VIII. The plaintiff's ordinary and necessary operating expenses per annum are $1,078,671.42, to which must be added taxes, state and federal, $112,352.97, making a total of $1,191,024.39; and 7½ per cent. return on $4,599,978.22, the value of the property, amounts to $345,000, making a total amount to which it is entitled to earn from its public service $1,536,024.39. Upon this amount should be credited nonoperating and other revenue $15,202.62, leaving to be earned annually by fares charged to its passengers upon its street cars $1,520,821.77.

"IX. As a conclusion it is found that under the rates and charges established by the Railroad and Warehouse Commission of Minnesota, in and by its order of July 13, 1923, the plaintiff could not and will not earn sufficient to meet its operating expenses and taxes and receive a net return of 7½ per cent. upon the fair value of its property as it was on December 31, 1921, and that the enforcement of said order would therefore deprive plaintiff of its property without just compensation; that to earn such return the plaintiff must be permitted to charge and collect 6 cents for each passenger carried by it in the city of Duluth."

Washburn, Bailey & Mitchell, of Duluth, Minn., for Duluth St. Ry. Co.

Ivan Bowen, of St. Paul, Minn., Ernest C. Carman, Asst. Atty. Gen., and Clifford L. Hilton, Atty. Gen., for Railroad and Warehouse Commission.

John B. Richards, for City of Duluth.

4 F.(2d)—35

BOOTH, District Judge. The above-entitled cause came regularly on for hearing upon exceptions to the report of the special master heretofore appointed in said cause. The suit is one brought to enjoin the enforcement of an order of the Railroad and Warehouse Commission of the State of Minnesota, fixing rates to be charged by plaintiff in the city of Duluth.

[1] At the outset the contention is again made by the defendants that the suit is premature. This question was passed upon at an earlier stage in this case and it is not necessary to discuss it here at length. The conclusions heretofore reached are adhered to, viz.: That, when the Railroad and Warehouse Commission made and filed its findings and order of July 13, 1922, fixing the rate of fare for plaintiff company, the legislative stage was ended at that point, and the judicial stage was reached; that the hearing before the state district court on appeal which is provided for in section 10 of the act (chapter 278, Laws of 1921 of the State of Minnesota) is judicial and not a continuation of the legislative rate-making process, otherwise the section is void; and, finally, that under such circumstances the street railway company had the right to bring the present suit in the federal court.

As supporting these conclusions may be cited: Bacon v. Railway Co., 232 U. S. 134, 34 S. Ct. 283, 58 L. Ed. 538; Prendergast v. Telephone Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; N. W. Bell Tel. Co. v. Hilton (D. C.) 274 F. 384; Steenerson v. Railway Co., 69 Minn. 353, 375, 72 N. W. 713; State v. Great Northern Ry., 130 Minn. 57, 153 N. W. 247, Ann. Cas. 1917B, 1201.

See, also, Keller v. Potomac Elec. Co., 261 U. S. 428, 43 S. Ct. 445, 67 L. Ed. 731; Abilene Ry. v. U. S. (D. C.) 288 F. 102; same case, 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016; Monroe Gas Co. v. Mich. P. U. C. (D. C.) 292 F. 139.

The cases of State v. Macdonald, 26 Minn. 445, 4 N. W. 1107, State v. Flaherty, 140 Minn. 19, 167 N. W. 122, and State v. Koochiching Co., 146 Minn. 87, 177 N. W. 940, are not in my judgment opposed to the foregoing conclusions. The questions taken up and disposed of by the courts in those cases were considered judicial questions, or at least quasi judicial questions.

It is contended by plaintiff that, even though it be conceded that the state district court was clothed with legislative power by the act (chapter 278, Laws Minn. 1921), and that consequently the legislative stage of rate making had not yet ended when the

present suit was started, nevertheless the plaintiff was justified in bringing the present suit in the federal court, because it had exhausted its remedy under the state procedure to obtain relief from existing continuing confiscation.

In other words, it is contended by plaintiff that even if an appeal had been taken to the state district court, and if that court had made an order suspending the rate fixed by the Commission, in that event the old franchise rate of five cents would have automatically come into effect under the terms of the act, and that greater confiscation would thus have resulted, and that in view of this situation plaintiff had the right to seek and obtain relief in the federal court.

Plaintiff claims that its contention in this respect is supported by the cases: Love v. Atchison, etc., Ry., 185 F. 321, 107 C. C. A. 403; Okla. Co. v. Love, 252 U. S. 331, 40 S. Ct. 338, 64 L. Ed. 596; Okla. Gas Co. v. Russell, 261 U. S. 290, 43 S. Ct. 353, 67 L. Ed. 659; Pacific Tel. & Tel. Co. v. Kuykendall, 265 U. S. 196, 44 S. Ct. 553, 68 L. Ed. 975.

On the other hand, the defendants contend that the plaintiff has no standing in court to oppose the continuation of the five-cent fare, pending the fixing of a new rate by the proper legislative authority, because plaintiff is bound by its contract to that effect contained in the act. Defendants cite the cases: City of Opelika v. Opelika Co., 265 U. S. 215, 44 S. Ct. 517, 68 L. Ed. 985; St. Cloud Public Service Co. v. City of St. Cloud, 265 U. S. 352, 44 S. Ct. 492, 68 L. Ed. 1050.

I do not find it necessary to pass upon these opposing contentions, in view of what has been heretofore said.

[2] It is further contended by defendants that the present suit was premature, because no test period had been had of the rates fixed by the Commission. A test period, however, is not an indispensable prerequisite. This was determined by the hearing before the court of three judges on the motion for an interlocutory injunction. See City of Louisville v. Louisville Tel. Co. (C. C. A.) 279 F. 949, 956; Prendergast v. Tel. Co., supra.

Turning to the merits: The act (chapter 278, of the Laws of Minnesota 1921) provides:

"Sec. 6. Rates of fare and charges within any city shall be just, fair and reasonable and shall be sufficient to yield only a reasonable return on a fair value of the street railway property of the street railway within such city."

"Sec. 9. If the petition be to fix a rate of fare, the Commission shall after hearing as herein provided fix a rate of fare to be charged by the street railway which will yield only a reasonable return on the fair value of the street railway property of such street railway within the city, as provided by this act."

[3] The Fourteenth Amendment to the Constitution of the United States provides a guaranty against a confiscatory rate. The maximum and the minimum are therefore fixed; within the space between, if there is any such space, the action of the Commission is unassailable.

[4] The proceedings before the special master and in this court are not for the purpose of fixing a rate, but to determine whether the rate fixed by the Commission is confiscatory. In Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, United States Supreme Court, June 2, 1924, the court said:

"Rate making is no function of the courts. Their duty is to inquire concerning results and uphold the guarantees which inhibit the taking of private property for public use without just compensation, under any guise."

Nevertheless, it is held that the parties are entitled to the independent judgment of the court upon the findings and conclusions of the Commission. Bluefield Co. v. Pub. Ser. Com., 262 U. S. 679, 689, 43 S. Ct. 675, 67 L. Ed. 1176.

With these rules in mind, consideration has been given to the various matters covered by the order of the Commission and reviewed in the findings and report of the master. The findings of the master are attached to this decision for convenience of reference.

Both the company and the city have taken exception to each of the findings (except the formal ones), and these general exceptions include subordinate exceptions to almost all of the items going to make up the rate base, and to very many of the items of the operating expenses.

It is obviously impossible, without unduly extending this decision, to discuss each of these numerous exceptions; they have all been considered, but only the more important will be discussed.

### The Rate Base and Its Items.

The valuation fixed by the Commission was $4,599,978.22. The valuation was made as of December 31, 1921. The master in his report states:

"On the hearing before the Commission and here, the engineers of the respective parties agreed upon an inventory of the physical properties; also, excepting land, the cost of reproducing those properties, upon four different bases, but reached no agreement as to the value of the land, the power contract, expenditures not apparent in the inventory, engineering and superintendence, administration, organization and legal expenses, taxes during construction, interest during construction, working capital, cost of financing, development cost or going value."

These agreed bases were: (1) Pre-war prices current 1915, $3,488,161. (2) Average ten years, 1911–1921, $4,864,437. (3) Current prices June, 1921, $6,308,966. (4) Original or investment cost, $3,487,020. (I. e. "The estimated cost of reproducing the property as of July 1, 1921, using prices in effect when the property was installed or purchased.")

The items of the Commission's valuation were as follows (as of July 1, 1921):

Physical property (undepreciated) excluding land.................$3,940,000.00
General overheads..............  550,000.00
Power contract.................  110,000.00

$4,600,000.00

Depreciated value of the three foregoing items, rate 17%..$3,818,000.00
Lands .............  140,000.00
Working capital, materials and supplies ............  135,000.00
Going concern......  500,000.00

$4,593,000.00
Additions to December 31, 1921.......  6,978.22

Total December 31, 1921..................$4,599,978.22

The master, after considering these various items and the evidence pertaining thereto, for the purpose of test and comparison, built up independently from the evidence a cost of reproduction, which he found to be $5,138,504.61. He also estimated the original cost as well as he was able from the evidence at $4,222,573. He found the valuation for taxation as estimated by the public authorities to be $3,437,436; and he found the capitalization of the company:

Bonds (5%).......$2,519,882.00
Stock ............. 1,200,000.00

Total ....................$3,719,882.00

After considering all the evidence, the master reached the conclusion to adopt the figures fixed by the Commission, $4,599,978.-22, which he segregated as follows:

Inventory, including all original costs (except land, materials, supplies, and working capital)..$3,986,504.22
Going value....................  350,000.00

$4,336,504.22
Land .........................  128,474.00
Materials and supplies..........  105,000.00
Working capital................  30,000.00

Total ....................$4,599,978.22

The working capital and materials and supplies were found the same by the Commission and the master, $135,000.

But it is, I think, readily inferable from the master's report and from the Commission's order that they differed as to all other items. The Commission allowed for overheads (depreciated), $456,500; the master allowed $369,524. The Commission allowed for land $140,000; the master allowed $128,-471. The Commission allowed for going value $500,000; the master allowed $350,000. The Commission allowed for power contract $91,300; the master allowed nothing. Both allowed 17 per cent. for accrued depreciation.

1. Physical Property Except Land.

As heretofore stated, the agreed estimated cost of reproducing the inventory items on the investment basis, was $3,487,020. It may be noted here that this figure closely corresponded with the basis on pre-war prices, which was $3,488,161. The depreciated value of this amount ($3,487,020), using 17 per cent., the Commission's figure, would be $2,894,227. The depreciated value of the inventory items used by the Commission was $3,270,200.

It is therefore contended by plaintiff that the Commission allowed but 12.99% increase to give effect to present day prices.

The master's inventory cost figure on the same basis and depreciated was $3,986,-504.22. This, however, includes

Overheads ......................$369,534.00
The cost of financing..............  89,075.00
The value of the additions between July and Dec. 1921.............  6,978.22

A total of....................$465,587.22

These, being subtracted from the above inventory figure of the master, leave $3,520,-917.

Plaintiff compares this figure with the agreed estimated cost on the investment basis, depreciated ($3,487,020.00+[1]$6,385.00=

---

[1] An item included by the master, but not found in the inventory.

$3,493,405.00–17 per cent. depreciation), $2,899,527, and contends that it is thus apparent that the master allowed but 21.4+per cent. increase to give effect to present day prices.

We have then for comparison the analyzed figures of the Commission and of the master:

| | Commission. | | Master. | |
|---|---|---|---|---|
| | Undepreciated. | Depreciated by 17%. | Undepreciated. | Depreciated by 17%. |
| | | | $3,487,020.00 | |
| | | Outside of Inventory | 6,385.00 | |
| Cost inventory items of physical property, excluding land, investment basis.............. | $3,487,020.00 | $2,894,227.00 | $3,493,405.00 | $2,899,527.00 |
| | | | Add 21.43+ per cent. | |
| Add 12.99 + per cent. making... | $3,940,000.00 | $3,270,200.00 | making | $3,520,917.00 |
| Cost of financing.............. | | | | 89,075.00 |
| Overhead ..................... | 550,000.00 | 456,500.00 | | 369,534.00 |
| Power contract................ | 110,000.00 | 91,300.00 | | |
| | $4,600,000.00 | $3,818,000.00 | | |
| Lands ........................ | | 140,000.00 | | 128,474.00 |
| Working capital supplies and materials ........ | | 135,000.00 | | 135,000.00 |
| Going value................... | | 500,000.00 | | |
| | | $4,593,000.00 | | $4,593,000.00 |
| Additions July to Dec., 1921.............. | | 6,978.22 | | 6,978.22 |
| | | $4,599,978.22 | | $4,599,978.22 |

Whether the value of the inventory items of physical property, less land, was arrived at by the Commission and by the master in the manner above indicated, may not be certain; but the net result would seem to be as indicated.

It is my opinion, therefore, based upon the evidence, and in view of the decisions of the courts, that sufficient consideration was not given to the increase in prices in the past few years.

In the Rand Case (C. C. A.) 285 F. 818, the master, under somewhat similar circumstances, used a 25 per cent. increment over pre-war prices, to arrive at the then present prices. The Circuit Court of Appeals said this was insufficient and used a 50 per cent. increment. The value in the Rand Case was made as of January 1, 1920; in the present case, as of December 31, 1921. But the Circuit Court of Appeals, speaking as of January 8, 1923, used the following language:

"We are authorized to take notice that no marked recession of prices has taken place since the time this case was heard by the master and that there is no present appearance of an assured reduction."

Since that time there have been, in my judgment indications of a reduction in general prices to some extent; but I think in the instant case at least a 40 per cent. increase should have been used on that part of the inventory basis figures which represented pre-war items. This, the evidence fairly shows, was $2,830,189. The modified figures would thus appear as follows:

Undepreciated value inventory items, less land, investment basis ....................$3,487,020.00
Add outside of inventory......... 6,385.00

Total ....................$3,493,405.00
Add 40% on $2,830,189......... 1,132,075.00

Total ....................$4,625,480.00
Depreciation 17%.............. 786,331.00

Depreciated value..............$3,839,149.00

The table of agreed upon bases of valuation above given is ample evidence to sustain this modification.

## 2. Overheads.

The Commission used the sum of several different percentages on separate items amounting in all to 14 per cent. on the value of the physical investment, making $550,-

000, and then depreciated this by 17 per cent., making $456,500.

While this is a not unusual method, yet it seems to me that where careful estimates of overheads actually incurred are available, such figures are preferable to the percentage figures. The master found the amount $369,534 based upon such estimates. I approve his finding.

### 3. Power Contract.

The Commission found that prior to 1907 the company had generated its own electricity in a plant owned by it. In 1907 a contract for electric power was entered into with a company developing water power, which contract runs until 1931. This contract has proven very advantageous and the steam plant has been superseded and has been dismantled. The Commission further found that the reasonable value of the power contract for the remaining life of the same was $110,000. This figure was depreciated by 17 per cent., making $91,300, allowed. A larger amount would have been justified.

[5] The master allowed nothing for this item, saying in his report:

"While this contract might be taken into consideration upon a sale of the property or a valuation for that purpose, it should not be considered in ascertaining the proper basis for rates as it belongs to the class of provident economical contracts which it is the duty of the company to make whenever possible so as to furnish economical service to the public."

I am not able to agree with the master in this view. The contract was a thing of value, and it differed from an ordinary contract for current supplies. It took the place of a physical plant which would otherwise have been necessary and would have been valued as a part of the physical items.

Under these circumstances, I think the Commission was justified in including this power contract as an item in the rate base. Support is to be found for this action in the following cases: Pac. Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075; Bonbright v. Geary (D. C.) 210 F. 44, 53; Valparaiso v. Public Ser. Comm., 190 Ind. 253, 129 N. E. 13. See, also, St. Louis & East St. Louis Ry. v. Hagerman, 256 U. S. 314, 41 S. Ct. 488, 65 L. Ed. 946.

It may perhaps be open to question whether this matter of power contract and the dismantled plant might not have been treated as an unusual obsolescence and allowance made on that basis.

### 4. Land.

While there is not a great difference between the amount allowed by the Commission and the master, yet I think the lower figure of the master is justified by the evidence and should be approved, viz., $128,474.

### 5. Working Capital, Material, and Supplies.

Both the Commission and the master agreed on these items and fixed the amount at $135,000, which I think should be approved.

### 6. Going Value.

The Commission allowed $500,000; the master, $350,000. This item is often figured as a certain percentage on the original cost of the inventoried physical property, excluding land and materials. Here the master allowed 10 per cent. on such original cost, which amounted to $350,000. As this amount seems to be more nearly in accord with the allowance made in the Rand Case (C. C. A.) 285 F. 818, and in the Denver Water Case, 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649, than the amount fixed by the Commission, I think the amount fixed by the master should be approved.

### 7. Cost of Financing.

The master has included one item which does not appear separately in the Commission's table, viz., cost of financing. In my opinion this is an item which should only be included, provided the evidence shows that it had an actual as distinguished from a theoretical existence. The master so found, and I think his finding is supported by the evidence, and that the amount allowed by him, $89,075, should be approved.

A summary of these various items appears as follows:

| | |
|---|---:|
| Undepreciated cost of physical property items, excluding land | $3,493,405.00 |
| Add 40% on $2,830,189.00 | 1,132,075.00 |
| | $4,625,480.00 |
| Depreciation 17% | 786,331.00 |
| Depreciated value | $3,839,149.00 |
| Overheads | 369,534.00 |
| Land | 128,474.00 |
| Working capital, materials and supplies | 135,000.00 |
| Cost of financing | 89,075.00 |
| Going value | 350,000.00 |
| Power contract | 91,300.00 |
| Additions between July, 1921, and December, 1921 | 6,978.00 |
| Total | $5,009,510.00 |

This total is in my judgment a fair rate base as shown by the evidence in the case.

### Rate of Return.

The rate found reasonable by both the Commission and the master was 7½ per cent. The evidence, I think, fully justified this finding.

### Operating Expenses.

The Commission found the amount based upon the year 1921 to be $1,111,726.84, which included state taxes but not federal income tax. This latter should, however, be added. See Georgia Ry. & Power Co. v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

[6] The master, basing his figures upon the year ending July 31, 1923, after making several minor changes and deducting $38,000 from the company's estimate of operating expenses, then added the amount of the federal income tax, estimated, and found the amount of operating expenses to be $1,191,024.

[7] Among the items of operating expense is one for the expense of litigation in connection with the present valuation proceedings and rate hearings, and an amortized portion of this was allowed both by the company and the master. While I do not think the expenses of rate litigation should ordinarily be included in operating expenses, yet in the instant case such a charge to operating expenses would seem to be authorized by the provisions of the act (chapter 278, Laws 1921).

The item of annual depreciation of $115,000 cannot be considered excessive, in view of the modified valuation above given.

I think the operating expenses as found by the master should be approved.

### Income Required.

We have the rate base, $5,009,510; return at 7½ per cent., $375,713.25; operating expenses and taxes, $1,191,024.00. Adding the last two items, we have necessary income to be provided, $1,566,737.25; of this, necessary to come from fares, $1,551,535.

### Estimated Revenue.

The Commission apparently estimated the revenue as follows: 27,030,000 passengers; a 6-cent rate; 5 tickets for 25 cents; also, that two-thirds of the passengers would use tickets, which would make a 5⅓-cent average rate. This would produce—

Revenue ....................... $1,441,600.00
Other revenue................... 15,202.00

    Total revenue.............. $1,456,802.00

The actual number of passengers carried for the year ending July 31, 1923, as shown by the evidence before the master, was—

25,384,100, which at 5⅓ cents
    would produce................. $1,353,818.00
Other revenue................... 15,202.00

    Total revenue.............. $1,369,020.00
25,384,100 passengers at 6 cents
    would produce................. $1,523,046.00
Other revenue................... 15,202.00

    Total ..................... $1,538,248.00

It is claimed, however, that the figures 25,384,100 were abnormally low, owing to several alleged unusual factors, for example, bad feeling on the part of the public, due to the interlocutory injunction issued in this case, and resulting in a large use of jitneys. The master concluded that such factors were largely speculative, but further held that, giving all weight to such factors, the estimated number of passengers would not be increased beyond 26,114,100.

This number, at 5⅓ cents, would
    produce .................... $1,392,752.00
Other revenue................... 15,202.00

    Total ..................... $1,407,954.00

That there would have been some increase is quite probable, but it may well be doubted whether it would have been more than sufficient to make up the difference between the actual income on a 6-cent basis, $1,538,248, and the needed income, $1,566,737.

[8] While the foregoing modifications in the findings of fact of the master have seemed to me to be necessary, yet they do not, in my judgment, necessitate any change in the final conclusion reached by the master, but rather strengthen and confirm that conclusion, viz., that the enforcement of the order of the Commission of July 13, 1923, would deprive plaintiff of its property without just compensation; and that to earn a sufficient return to avoid confiscation, plaintiff must be permitted to charge and collect 6 cents for each passenger carried by it in the city of Duluth.

This conclusion is accordingly approved and confirmed. Some changes will be necessary in the form of the final decree submitted by the master. Unless the parties agree as to the form of such a decree, a hearing to settle the decree may be had on five days' notice. Costs will be fixed and apportioned at the same time.

Except as indicated in the foregoing decision, all exceptions are overruled.