## CITY OF KNOXVILLE v. KNOXVILLE WATER COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TENNESSEE.

No. 17.   Argued April 28, 1908.—Decided January 4, 1909.

Rate making is a legislative function whether exercised by the legislature or by a subordinate body to which power has been delegated, such as a municipality.

While courts may refuse to enforce legislation on constitutional grounds the power should only be exercised in the clearest cases.

In ordinary equity suits findings of the master and the court below are conclusive here unless unsupported by the evidence or made under erroneous views of law; but where the constitutionality of a legislative act is involved, this court, from the respect due to legislative authority, will not regard such findings as conclusive.

In estimating for rate-fixing purposes the value of a plant, cost of reproduction is not a fair measure of value unless a substantial allowance is made for depreciation. *Quære*, whether anything can be allowed in the case of the plant of a public service corporation for "going concern" above the value of the separate tangible elements.

In valuing for rate-fixing the plant of a public service corporation, bonds and stocks issued for its purchase and construction in excess of its cost and by and to parties interested in and controlling the company, afford neither measure nor guide.

In determining whether a rate affords a fair return the amount must be considered as fixed by the ordinance and not as voluntarily reduced by the corporation, even if such reduction be in accordance with custom and for the purpose of obtaining prompt payment.

In determining whether a rate is confiscatory the court is not confined to evidence as to the income of the corporation affected for the fiscal year during, or preceding that in, which the rate was fixed; it may receive evidence as to such income in subsequent years.

Federal courts should not declare an ordinance fixing rates for a public service corporation unconstitutional and suspend its operation before it goes into effect unless the rate is clearly confiscatory; and unless complainant furnishes substantial evidence to that effect, the bill should be dismissed without prejudice to a further application to the courts if the rate after going into effect is actually confiscatory.

A sufficient amount should be allowed from the earnings of a public service corporation for making good depreciation of plant and replacing deteriorated portions thereof; but amounts so expended cannot be considered as additional to the original cost in valuing the plant for purposes of ascertaining whether a rate is confiscatory.

*Quære*, and not decided, whether, under the circumstances of this case, an ordinance fixing a rate yielding a return of four per cent after allowing two per cent for depreciation is confiscatory, and amounts to a deprivation of property without due process of law or a taking of property without compensation.

THE facts, which involve the constitutional validity of an ordinance of the city of Knoxville fixing maximum rates to be charged for water by the defendant water company, are stated in the opinion.

*Mr. George W. Pickle*, with whom *Mr. J. Pike Powers, Junior, Mr. W. R. Turner* and *Mr. W. T. Kennerly* were on the brief, for appellant:

The ordinance of March 30, 1901, was not unconstitutional; it did not violate any valid contract between the city and the company, or undertake to change the contract as to rates between the company and the city itself, but only to regulate the rates charged by the water company to other water consumers than the city. The city has power to regulate the water rates by ordinance and that power has not been curtailed by contract.

*Knoxville Water Co.* v. *Knoxville,* 107 Tennessee, 647; *S. C.,* 189 U. S. 434.

The ordinance of March 30, 1901, is not unconstitutional and void for the alleged reason that it was passed arbitrarily without notice to the water company or without giving it a hearing or an opportunity to be heard or without an investigation of its business. This contention is not supported by any proof. But if the facts averred were proved, that would not, as a matter of law, invalidate the ordinance. This question is precluded by the decisions hereinbefore cited.

The law under which the rates were fixed does not require notice or investigation, nor does it declare the action of the city council final. Unless the action of the city council had been made final and conclusive upon the water company, or the law had required notice and investigation and hearing, the ordinance fixing the rates remains open for inquiry of the character that is made in this case, and if the court finds that the rates are reasonable, or that there is any doubt of it, the same will be sustained. *San Diego &c. Co.* v. *Jasper,* 189 U. S. 439; *San Diego L. & T. Co.* v. *National City,* 174 U. S. 739.

The Supreme Court of Tennessee has held that the rates fixed by this ordinance are not made final and conclusive but remain open to judicial investigation. *Knoxville* v. *Water Co.,* 107 Tennessee, 688.

The rates prescribed by the city's ordinance of March 30, 1901, are not confiscatory. The Circuit Court should have determined this question for itself.

It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot of its own motion or upon the request of one party abdicate its duty to determine by its own judgment the controversy presented and devolve that duty upon any of its officers. *Kimberly* v. *Arms,* 129 U. S. 512; *Patton* v. *Cone,* 1 Lea, 19; *Carey* v. *Williams,* 1 Lea, 54; *Jones* v. *Douglass,* 1 Tenn. Chy. 357; *Remsen* v. *Remsen,* 2 Johnson's

Chy. Rep. 501; 2 Daniel's Chy. Prac. 1004, note 7; 1221, note 2 (4th ed.).

This court has, by its decisions, carefully guarded and limited the exercise of the jurisdiction of the courts affecting legislation, and has thus far permitted only the most sparing use of the power to revise or annul rates when fixed by legislative action. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362; *Covington &c. Co.* v. *Sandford*, 164 U. S. 578, and *Smyth* v. *Ames*, 169 U. S. 466, discussed as clearly distinguishable from case at bar.

The cases are numerous in which relief, in cases of the character of the case at bar, has been denied by this court and by other courts. *San Diego Co.* v. *National City*, 174 U. S. 739; *Railroad Co.* v. *Wellman*, 143 U. S. 399; *Stanislas County* v. *San Joaquin Co.*, 192 U. S. 201; *Dow* v. *Beidleman*, 125 U. S. 680; *Railroad Co.* v. *Gill*, 156 U. S. 649; *San Diego L. & T. Co.* v. *Jasper*, 189 U. S. 439; *Railroad Co.* v. *Minnesota*, 186 U. S. 257; *Railroad Co.* v. *State*, 25 Florida, 310; *S. C.*, 3 L. R. A. 661.

So this court has refused to sustain the action of inferior courts restraining rates as unreasonable and confiscatory where the investigation reaching that result has been made in the lower courts along improper lines. *Railroad Company* v. *Tompkins*, 176 U. S. 167; *Railroad Co.* v. *Interstate Commerce Commission*, 162 U. S. 197; *Cotting* v. *Stock Yards*, 183 U. S. 79, 90.

Mr. *J. W. Caldwell* and Mr. *R. E. L. Mountcastle*, with whom Mr. *Charles T. Cates, Junior*, and Mr. *S. G. Shields* were on the brief, for appellee:

The rule of law applicable to this case is that the company is entitled to demand, in order that it may have just compensation, a fair return upon the reasonable value of the property at the time it is being used for the public. *San Diego Land & Town Co.* v. *National City*, 174 U. S. 739, 757. See also *Covington & Lexington Turnpike Co.* v. *Sandford*, 164 U. S. 578,

597, 598; *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 442; *Southern Pacific Co.* v. *Board of Commissioners,* 78 Fed. Rep. 261; *Cotting* v. *Stock Yards,* 79 Fed. Rep. 679, 684; *Smyth* v. *Ames,* 169 U. S. 547.

With respect to the date at which the fair value of the property of complainant devoted to the public service should be ascertained as a condition precedent to the ascertainment of what is a fair return thereon, it may be stated that no controversy has arisen in this case, so that said date was approximately March 30, 1901, the date of the passage of the ordinance attacked, though, as a matter of fact, the real date adopted was March 31, 1901, for the reason that March 31 was the close of the fiscal year of the company, and both valuation and income could more readily be arrived at by assuming that as the date of the inquiry. No assignment of error is made in this court controverting the proposition that the fair value of the property of complainant should be ascertained at the date when it was in fact ascertained in this case. *Smyth* v. *Ames,* 169 U. S. 466.

Each case must depend upon its special facts. *Turnpike Co.* v. *Sandford,* 164 U. S. 578. As to the elements to be considered in the ascertainment of the fair value of the plant devoted to the public service, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under the particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in such case. *Smyth* v. *Ames,* 169 U. S. 547.

The basis of calculation in a rates case is: the fair value of the property being used for the public convenience, and in ascertaining that fair value we may consider: The original cost of the plant; cost of permanent improvements; amount of bonds; market value of bonds; amount of stock; market value of the stock; present cost of construction; earning capacity

under the ordinance; and operating expenses. *Smyth* v. *Ames, supra*.

The finding of the master as to the value of complainant's plant, as of the date of the passage of the ordinance, if supported by evidence in the case, and affirmed by the lower court, is unassailable in this court. And the findings were fully supported by the evidence. Taylor on Jurisdiction and Procedure of the United States Supreme Court, § 426, and cases cited; *B. & P. R. R. Co.* v. *Mackey*, 157 U. S. 92; *Anthony* v. *Louisville & Nashville Ry. Co.*, 132 U. S. 173; *Davis* v. *Schwartz*, 155 U. S. 636.

MR. JUSTICE MOODY delivered the opinion of the court.

This is an appeal by the city of Knoxville from a decree of the Circuit Court of the United States for the Eastern District of Tennessee. The appellee is a public service corporation, chartered for, and engaged in, the business of supplying that city and its inhabitants with water for domestic and other uses. The cause in which the decree was rendered is a suit in equity which was brought by the company on December 7, 1901, against the city to restrain the enforcement of a city ordinance fixing in detail the maximum rates to be charged by the company. This ordinance was enacted on March 30, 1901. The bill contained many allegations, which have become immaterial by the decision of this court in *Knoxville Water Company* v. *Knoxville*, 189 U. S. 434, in which the validity of the ordinance was sustained, except so far as it might confiscate the property of the company by fixing rates so low as to have that effect. The latter contention alone was left open to the company, and to it the remainder of the bill is mainly directed. The allegations in that regard are, that the rates fixed by the ordinance were so low that they denied to the company a reasonable return upon the property employed in the business, and thereby took it for public use without compensation, in violation of the Fourteenth Amendment to

the Constitution of the United States. After answer by the respondent and replication by the complainant the cause was referred to a special master, whose report was confirmed by the court. The master found and reported that the value of the plant and property employed in the business at the date of the passage of the ordinance was $608,427.95; that the gross. income from the company's business was $88,481.39, and that the operating expenses were $34,750.91. The figures of income and expense are those of the fiscal year ending March 31, 1901, and the valuation was made as of that date. The master found and reported that the diminution of income which would have resulted from the enforcement of the ordinance during that fiscal year was $17,623.64, and that the gross income would have been reduced thereby to $70,857.75, leaving a net income of $36,106.84. This net income was less than 6 per cent on the valuation. In the opinion of the master 8 per cent, which included 2 per cent to provide for depreciation, was the minimum net return which the company was entitled to earn. The judge of the Circuit Court, in his opinion confirming the master's report, adopted the master's valuation of the whole plant and property at $608,427.95 (although he held that it ought to be increased by about $3,000.00), and the master's finding that the gross income was $88,481.39; that the expenses were $34,750.91; that the effect of the reduction made by the ordinance would be to lessen the gross income by $17,623.64, and that therefore the net income under the ordinance would be $36,106.84, or about $400.00, less than 6 per cent on the valuation. Upon these assumptions of fact as to its effect the judge regarded the ordinance as confiscatory and issued a permanent injunction against its enforcement.

At the threshold of the consideration of the case the attitude of this court to the facts found below should be defined. Here are findings of fact by a master, confirmed by the court. The company contends that under these circumstances the findings are conclusive in this court, unless they are without support in the evidence or were made under the influence of er-

roneous views of law. We need not stop to consider what the effect of such findings would be in an ordinary suit in equity. The purpose of this suit is to arrest the operation of a law on the ground that it is void and of no effect. It happens that in this particular case it is not an act of the legislature that is attacked, but an ordinance of a municipality. Nevertheless the function of rate-making is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power. *Prentis* v. *Southern Railway Co.*, 211 U. S. 210; *Honolulu Transit Co.* v. *Hawaii*, 211 U. S. 282. There can be at this day no doubt, on the one hand, that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and where that invalidity rests upon disputed questions of fact the invalidating facts must be proved to the satisfaction of the court. In view of the character of the judicial power invoked in such cases it is not tolerable that its exercise should rest securely upon the findings of a master, even though they be confirmed by the trial court. The power is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question sometimes be regarded as conclusive. All that is intended to be said is, that in cases of this character this court will not fetter its discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit.

The first fact essential to the conclusion of the court below is the valuation of the property devoted to the public uses, upon which the company is entitled to earn a return. That valuation ($608,000) must now be considered. It was made up by adding to the appraisement, in minute detail of all the tangible property, the sum of $10,000 for "organization, promotion, etc.," and $60,000 for "going concern." The latter sum we understand to be an expression of the added value of the plant as a whole over the sum of the values of its component parts, which is attached to it because it is in active and successful operation and earning a return. We express no opinion as to the propriety of including these two items in the valuation of the plant, for the purpose for which it is valued in this case, but leave that question to be considered when it necessarily arises. We assume, without deciding, that these items were properly added in this case. The value of the tangible property found by the master is, of course, $608,000 lessened by $70,000, the value attributed to the intangible property, making $538,000. This valuation was determined by the master by ascertaining what it would cost, at the date of the ordinance, to reproduce the existing plant as a new plant. The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company, but that test would lead to obviously incorrect results, if the cost of reproduction is not diminished by the depreciation which has come from age and use. The company contends that the master, in fixing upon the valuation of the tangible property, did make an allowance for depreciation, but we are unable to agree to this. The master nowhere says that he made allowance for depreciation and the language of his report is inconsistent with such a reduction. The figures which he adopts are those of a "fair contractor's price." The basis of his calculation was the testimony of an opinion witness called by the company. That witness submitted a table, which avowedly showed the cost of reproduction, without allowance for depreciation. The values testified to by him were adopted by the master in the

great majority of cases. The witness's valuation of the tangible property was somewhat reduced by the master, but the reductions were not based upon the theory of depreciation, but upon a difference of opinion as to the reproduction cost.

The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years. The items composing the plant depreciate in value from year to year in a varying degree. Some pieces of property, like real estate for instance, depreciate not at all, and sometimes, on the other hand, appreciate in value. But the reservoirs, the mains, the service pipes, structures upon real estate, standpipes, pumps, boilers, meters, tools and appliances of every kind begin to depreciate with more or less rapidity from the moment of their first use. It is not easy to fix at any given time the amount of depreciation of a plant whose component parts are of different ages with different expectations of life. But it is clear that some substantial allowance for depreciation ought to have been made in this case. The officers of the company, *alio intuitu*, estimated what they called "incomplete depreciation" of this plant (which we understand to be the depreciation of the surviving parts of it still in use) at $77,000, which is 14 per cent of the master's appraisement of the tangible property. A witness called by the city placed the reproduction value of the tangible property at $363,000, and estimated the allowance that should be made for depreciation at $118,000, or 32 per cent. In the view we take of the case it is not necessary that we should undertake the difficult task of determining exactly how much the master's valuation of the tangible property ought to have been diminished by the depreciation which that property had undergone. It is enough to say that there should have been a considerable diminution, sufficient at least to raise the net income found by the court above 6 per cent upon the whole valuation thus diminished. If, for instance, the master's valuation should be diminished by $50,000, allowed for depreciation, the net earnings found by him would show a return of substantially 6.5 per cent.

Counsel for the company urge rather faintly that the capitalization of the company ought to have some influence in the case in determining the valuation of the property. It is a sufficient answer to this contention that the capitalization is shown to be considerably in excess of any valuation testified to by any witness, or which can be arrived at by any process of reasoning. The cause for the large variation between the real value of the property and the capitalization in bonds and preferred and common stock is apparent from the testimony. All, or substantially all, the preferred and common stock was issued to contractors for the construction of the plant, and the nominal amount of the stock issued was greatly in excess of the true value of the property furnished by the contracts. A single instance taken from the testimony will illustrate this. At the very start of the enterprise a contract was entered into for the construction of a part of the plant, which was of a value slightly, if at all, exceeding $125,000. The price paid the contractor was $125,000 in bonds and $200,000 in common stock. Other contracts for construction showed a like disproportion between value furnished and nominal capitalization received for that value. It perhaps is unnecessary to say that such contracts were made by the company with persons who, at the time, by stock ownership, controlled its action. Bonds and preferred and common stock issued under such conditions afford neither measure of nor guide to the value of the property.

We think that the master and the court erred in another respect, which might affect in an important way the amount which could have been realized under the operation of the ordinance. This error consisted in the manner of deducting the reductions necessarily made by the ordinance. The evidence in the record is not entirely clear, though, after careful consideration, we think it shows the following state of facts: The company's schedule prescribed certain rates, which we may call the book rates, but upon a large part of them a discount of 5 per cent was made if they were promptly paid. The

consumers very generally availed themselves of this discount. The discount rates constituted the actual collections, and may be called the actual rates. For the fiscal year which was examined the book rates amounted, in round numbers, to $93,000, while the actual rates amounted, as the master found, to $88,000. The percentage of reduction made by the ordinance was computed to be 22.88. This percentage was ascertained either by comparing the book rates with the ordinance rates, or by comparing the actual rates with the ordinance rates, still further reduced by a 5 per cent discount for prompt payment, which comes to substantially the same result. The fallacy in the process employed by the master consisted in substance in assuming that the ordinance rates would be subject to a discount for prompt payment. The company, it is true, might, if it chose, allow such a discount from the ordinance rates, but the ordinance required no discount from the rates established by it, and the company therefore was bound to offer none. If it stood upon the letter of the ordinance, as it had the right to do, and exacted from the consumers the full charges prescribed by the ordinance, the amount which would have been realized would have been over $4,000 more than that found by the master, or a net income of not less than $40,000. Doubtless, the abandonment of the common method of discount for prompt payment would deprive the company of an efficient aid to the quick collection of its bills, but in the case of a prime necessity like water there are other methods of enforcing prompt payment, though it is not unlikely that the elimination of the discount rate would add somewhat to the cost of collection, and thereby to the operating expenses.

A brief recently filed by the city, to which no reply has been made, seems to show conclusively that there was still another error in ascertaining the amount of reduction effected by the ordinance. What was actually done was to deduct the 22.88 reduction from the actual water rates (excluding hydrant rentals, which were not changed), but of these actual water rates $10,000 came from territory outside of the corporate

limits, which was not affected by the ordinance. From this $10,000 no percentage should have been deducted. The reduction, therefore, was too large by over $2,000. If this correction should be made, it would amount to nearly four-tenths of one per cent on the capitalization.

We are also of opinion that the master and the court erroneously excluded evidence which had an important bearing upon the true earning capacity of the company under the ordinance. A clear appreciation of this error can be best obtained by a comprehensive review of the hearing. The company's original case was based upon an elaborate analysis of the cost of construction. To arrive at the present value of the plant large deductions were made on account of the depreciation. This depreciation was divided into complete depreciation and incomplete depreciation. The complete depreciation represented that part of the original plant which through destruction or obsolescence had actually perished as useful property. The incomplete depreciation represented the impairment in value of the parts of the plant which remained in existence and were continued in use. It was urgently contended that in fixing upon the value of the plant upon which the company was entitled to earn a reasonable return the amounts of complete and incomplete depreciation should be added to the present value of the surviving parts. The court refused to approve this method, and we think properly refused. A water plant, with all its additions, begins to depreciate in value from the moment of its use. Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the

beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both. If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon over-issues of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past.

After the company had closed its case the city undertook to determine the present value of the company's property by the plain method of ascertaining the cost of reproduction, diminished by depreciation. In its case in rebuttal, the company followed the same method, though the results differed largely, and, as we have seen, no proper allowance for depreciation was made. In the course of presenting its case the city offered evidence of the net income of some years subsequent to the passage of the ordinance. The case is peculiar. The company has never observed the ordinance. The suit was begun nine months after its enactment and tried considerably later. In the meantime the company's gross income had largely increased. But the decision in the court below was based solely on the operations of the fiscal year ending March 31, 1901, and the amount of net income ascertained, namely, $36,000, was obtained by applying the reductions made by the

ordinance to the operations of that fiscal year. We think it was error to confine the investigation to, and base the judgment upon, that year alone. The precise subject of inquiry was, what would be the effect of the ordinance in the future. The operations of the preceding fiscal year, or of any other past fiscal year, were valueless if the year was abnormal, and were only of significance so far as they foretold the future. If, as in this case, sufficient time has passed, so that certainty instead of prophecy can be obtained, the certainty would be preferable to the prophecy. In this case there could be no absolute certainty, because the ordinance had never been put in operation. But evidence of the operations of the years succeeding to the ordinance is relevant and of great importance, and by a consideration of such evidence a much greater degree of certainty could be obtained. Suppose, by way of illustration, that before bringing suit the company had put the ordinance into effect and had observed it for a number of years, and the result showed that a sufficient net income had been realized, is it possible that a suit then could be brought and the evidence confined to a period prior to the ordinance, and by a process of speculation the conclusion reached that the ordinance would be confiscatory? Some evidence regarding the income of the company, after the passage of the ordinance, is in the record, but it subsequently was excluded from consideration. It showed an increase of gross and net earnings, but also an increase in the property devoted to the public use. We are unable to say what the effect of the evidence excluded would be; all we can say is, that the inquiry was unduly limited by the exclusion of the evidence of the operation of subsequent years.

It follows from what has been said that the judgment of the court below cannot stand. There was error in the appraisement of the present value of the plant, in the deduction of the reductions made by the ordinance, and in the exclusion of evidence relating to the operations of the company after the enactment of the ordinance.

In ordinary cases full justice would be done by reversing the decree and remanding the cause for further proceedings in the court below, there to undergo a new and doubtless prolonged investigation. It is more than seven years since the enactment of the ordinance, and it has never been observed in any respect. This litigation ought now to be ended, if it is possible to end it with due regard to the rights of the contending parties. Disregarding for the moment all the errors which were committed in the court below, the decision of this cause may be rested upon a broader ground, which is clearly indicated by the previous judgments of this court. The jurisdiction which is invoked here ought, as has been said, to be exercised only in the clearest cases. If a company of this kind chooses to decline to observe an ordinance of this nature and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the Constitution of the United States. In *Ex parte Young*, 209 U. S. 123, the last word of caution by this court was said (p. 166): "Finally it is objected that the necessary result of upholding this suit in the Circuit Court will be to draw to the lower Federal courts a great flood of litigation of this character, where one Federal judge would have it in his power to enjoin proceedings by state officials to enforce the legislative acts of the State, either by criminal or civil actions. To this it may be answered, in the first place, that no injunction ought to be granted unless in a case reasonably free from doubt. We think such rule is, and will be, followed by all the judges of the Federal courts." The same thought, in effect, was expressed in *San Diego Land & Town Company* v. *National City*, 174 U. S. 739, 754, "judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property

taken for the public use." And in *San Diego Land & Town Company* v. *Jasper*, 189 U. S. 439, after repeating with approval this language, it was said (p. 441): "In a case like this we do not feel bound to reëxamine and weigh all the evidence, although we have done so, or to proceed according to our independent opinion as to what were proper rates. It is enough if we cannot say that it was impossible for a fair-minded board to come to the result which was reached."

It cannot be doubted that in a clear case of confiscation it is the right and duty of the court to annul the law. Thus in *Reagan* v. *Farmers' Loan & Trust Company*, 154 U. S. 362, where the property was worth more than its capitalization, and upon the admitted facts the rates prescribed would not pay one-half the interest on the bonded debt; in *Covington &c. Turnpike Co.* v. *Sandford*, 164 U. S. 578, where the rates prescribed would not even pay operating expenses; in *Smyth* v. *Ames*, 169 U. S. 466, where the rates prescribed left substantially nothing over operating expenses and cost of service; and in *Ex parte Young, supra*, where, on the aspect of the case which was before the court, it was not disputed that the rates prescribed were in fact confiscatory, injunctions were severally sustained. But the case before us is not a case of this kind. Upon any aspect of the evidence the company is certain to obtain a substantial net revenue under the operation of the ordinance. The net income, in any event, would be substantially 6 per cent, or 4 per cent after an allowance of 2 per cent for depreciation. See *Stanislaus County* v. *San Joaquin Company*, 192 U. S. 201. We cannot know clearly that the revenue would not much exceed that return. We do not feel called upon to determine whether a demonstrated reduction of income to that point would or would not amount to confiscation. Where the case rests, as it does here, not upon observation of the actual operation under the ordinance, but upon speculations as to its effect, based upon the operations of a prior fiscal year, we will not guess whether the substantial return certain to be earned would lack something of the return which would

save the effect of the ordinance from confiscation. It is enough that the whole case leaves us in grave doubt. The valuation of the property was an estimate and is greatly disputed. The expense account was not agreed upon. The ordinance had not actually been put into operation; the inferences were based upon the operations of the preceding year; and the conclusion of the court below rested upon that most unsatisfactory evidence, the testimony of expert witnesses employed by the parties. The city authorities acted in good faith, and they tried, without success, to obtain from the company a statement of its property, capitalization and earnings.

The courts, in clear cases, ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. Regulation of public service corporations, which perform their duties under conditions of necessary monopoly will occur with greater and greater frequency as time goes on. It is a delicate and dangerous function, and ought to be exercised with a keen sense of justice on the part of the regulating body, met by a frank disclosure on the part of the company to be regulated. The courts ought not to bear the whole burden of saving property from confiscation, though they will not be found wanting where the proof is clear. The legislatures and subordinate bodies, to whom the legislative power has been delegated, ought to do their part. Our social system rests largely upon the sanctity of private property, and that State or community which seeks to invade it will soon discover the error in the disaster which follows. The slight gain to the consumer, which he would obtain from a reduction in the rates charged by public service corporations, is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence. On the other hand, the companies to be regulated will find it to their lasting interest to furnish freely the information upon which a just regulation can be based.

If hereafter it shall appear, under the actual operation of the

ordinance, that the returns allowed by it operate as a confiscation of property, nothing in this judgment will prevent another application to the courts of the United States or to the courts of the State of Tennessee. But as the case now stands there is no such certainty that the rates prescribed will necessarily have the effect of denying to the company such a return as would avoid confiscation. For these reasons—

*The decree is reversed and the case remanded to the court below with directions to dismiss the bill without prejudice.*