[No. 21553.   Department Two.   May 22, 1929.]

THE STATE OF WASHINGTON, *on the Relation of Pacific County Bridge Company, Respondent,* v. THE DEPARTMENT OF PUBLIC WORKS, *Appellant.*[1]

[1]Reported in 277 Pac. 995.

*R. E. Ostrander,* for appellant department of public works.

*John I. O'Phelan,* for appellant Lilly *et al.*

*Welsh & Welsh,* for respondent.

MAIN, J.—This is an appeal from a judgment of the superior court reversing an order of the department of public works fixing the charges for the use of a toll bridge.

June 11, 1923, the board of county commissioners of Pacific county granted to K. L. Goulter and W. J. Mumford, for the period of ten years, a franchise to construct and operate a drawbridge over and across the Naselle river in that county. The north approach of the bridge was to be at a point about one thousand feet down stream or to the west from where the Ocean Beach highway intersects with the north bank of the river. The county agreed to exercise its right to purchase a steel draw-span, then on piers in the city of Raymond, for the sum of one dollar, and turn this span over to Goulter and Mumford for that sum. The Raymond span was to be erected as a part of the bridge for which the franchise was granted. The franchise also required that Goulter and Mumford should deposit, and keep on file, a bond or public liability insurance in the sum of $95,000 for the protection of the county in the case of accident occurring on the bridge.

After the franchise was granted and accepted, the county purchased the Raymond bridge, and turned it over to Goulter and Mumford for the sum of one dollar. Thereafter the Pacific County Bridge Company, a corporation, was organized and all the franchise rights were transferred to it. A contract was let and the bridge constructed. The cost of moving the Raymond span to the Naselle river was $9,000. The bridge was opened for travel June 26, 1924, and a

tariff of charges was filed with the department of public works. During the latter part of the year 1927, the department received complaints to the effect that the toll charges were too high. January 26, 1928, the department held a hearing with reference to the tolls for the use of the bridge, and evidence was taken. After this hearing, the department entered an order materially reducing the tolls, which order the bridge company caused to be reviewed by the superior court. The court, as above stated, reversed and set aside the order of the department fixing the tolls, and it is from this judgment that the department of public works appeals.

There are a number of items in dispute between the parties, some of which present questions of fact, and others questions of law. The primary and ultimate purpose of the proceeding before the department was to ascertain whether the rates and charges for the use of the bridge were reasonable or unreasonable, and to approve or correct, as the department should so find. Incidentally there was involved the value of the bridge as a basis for rate-making.

■ The first item which was in dispute was the value of the steel draw-span above referred to. The cost of this span, as it stood on the piers before its removal, was one dollar. The cost of removal was $9,000. The department fixed the value of the draw span at $9,001, which included the one dollar purchase price and the $9,000 for transporting it. The question was not what the span cost, added to the cost of its removal, but its reasonable value. In determining the reasonable value, those items might well be taken into consideration, but that is not the ultimate measure for determining the base for rate-making purposes. In *State ex rel. Spokane v. Kuykendall,* 119 Wash. 107, 205 Pac. 3, it is said:

"Preliminarily, it may be observed that it is difficult to perceive why, if it is permissible for the company to make a small return upon its investment in addition to that necessary to enable it to give efficient service, maintain its plant in good condition, and to provide for its operating expenses, taxes and depreciation, it should not be permitted to make a fair and reasonable return upon its investment in addition to those other things mentioned. If any doubt exists as to the latter being the rule, that doubt may be dispelled, for we are satisfied it is the policy of the statute, which is in harmony with guaranteed rights, that the owner shall receive a fair and reasonable return by way of interest or profit upon the reasonable value of his property used and useful in the public service."

If the bridge was worth more than one dollar, its reasonable value should be taken into consideration, and not merely its cost. Spur, Guiding Principles of Public Service Regulation, vol. 2, p. 139; 1917E Public Utility Reports, p. 757; 1915C Public Utility Reports, p. 473. In the last citation, it is said:

"As the property donated to the water company now belongs to it, the water company is, of course, entitled to have this property valued in this proceeding."

In *Board of Public Utility Com'rs v. New York Tel. Co.*, 271 U. S. 23, it is said:

"Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service."

The department should have found the reasonable value of the property.

The next item involves approximately thirty-six acres of land adjacent to the north approach of the bridge, which was turned over to the bridge company at $25 an acre. The department's engineer, as well as the engineer for the bridge company, allowed for this land the sum of $921, on the theory that the

entire tract could be acquired for the same as it would cost to acquire the necessary one or two acres to enable the bridge to be connected with the Ocean Beach highway. The department found that one acre of land was sufficient for this purpose, and fixed the value thereof at $25. There is no evidence as to the value of this particular acre, nor is there any evidence that its value was the same as the value of the acreage in the entire tract. The finding is not supported by the evidence, and the sum fixed by the two engineers should have been allowed.

■ The next item is that covering what is called organization and franchise. This item was fixed by the department's engineer as $7,500. The bridge company's engineer fixed it at substantially the same amount. The department reduced the item to $500. Under this item, among other things, was included the necessary legal expense involved in acquiring the franchise, obtaining a permit from the Federal government to construct the bridge, preparing the bonds and trust deed, trying a lawsuit, and other items which involved time and expense. The evidence shows the reasonable value of the legal services was practically the sum allowed by the engineers. We find no justification in the record for reducing this item to $500.

■ The next item relates to the cost of redriving the piles for the bridge. The evidence shows that it would be necessary to redrive the piles either during the latter part of the year 1928 or the early part of the year 1929. The cost of this work would be approximately $26,000. In fixing the toll, the department declined to take this cost into consideration. In 1925E Public Utility Reports, p. 518, it is said:

"The cost of the replacing of the green piles with creosoted piles should be charged, in part, to the accounts of investment, reserve for depreciation, and

operation, respectively. No attempt has been made at this time to forecast the proper amount to be charged to the various accounts, and as it appears that the company may be forced by the opening of the Carquinez bridge to discontinue ferry service in two years, the estimated cost of replacements, for the purposes of this proceeding, will be considered as an extraordinary expense and pro-rated over a period of two years.''

In *City of Knoxville v. Knoxville Water Co.,* 212 U. S. 1, it is said:

''Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public.''

The department was in error in not taking into consideration the cost of redriving the piles.

The next item relates to the portion of the profits which was to go to the county. The franchise provided that, after the bridge

'' . . . has been in operation for a period of six years, then the net profit derived from the operation of said bridge for the balance of the franchise period shall be divided equally between the owners of the franchise and Pacific county.''

The department did not take into consideration this fact. The franchise was for a period of ten years. The bridge company had a right to earn a sufficient

sum which, at the end of that time, would return to it the amount prudently invested, together with a reasonable income thereon after paying necessary operating expenses, cost of repairs and replacements. It being necessary, under the franchise, to pay one-half of the net income to the county after the bridge had been in operation for the period of six years, this should have been taken into consideration in fixing the toll. In *Chicago Railways Co. v. Illinois Commerce Commission,* 277 Fed. 970, it is said:

"Counsel for the city of Chicago claim that, in estimating the net earnings of the plaintiffs to their shareholders, the 55 per cent. of the earnings due to the city of Chicago should be included. This argument hardly merits comment. The payment to the city might have been made in dollars or sprinkling or pavement of streets. It was compensation paid to the city of Chicago for the use of its streets, and necessarily an overhead expense, to be paid before dividends or interest on the invested capital could be estimated."

Finally, it is contended by the appellant that the judgment should be reversed because the trial court made no findings of fact. As above stated, this was primarily a rate-making proceeding and, as such, came under Rem. Comp. Stat., § 10428, *State ex rel. Pacific Power & Light Co. v. Department of Public Works,* 143 Wash. 67, 254 Pac. 839. Section 10428 provides, among other things, that, upon a hearing before the court to review an order of the department, the "court shall enter judgment either affirming or setting aside the order of the commission under review." This statute does not require findings of fact to be made.

There are other items in dispute which it does not seem necessary to consider at this time, since what has already been said is sufficient to show that the trial court properly set aside the order of the department.

The judgment appealed from will be affirmed, but without prejudice to the department, if it elects so to do, to again consider the matter.

PARKER, FRENCH, MILLARD, and BEALS, JJ., concur.