## Commonwealth v. Louisville Gas & Electric Co.

Dec. 16, 1938.

DAVID A. McCANDLESS, B. W. GILFILLAN, LAWRENCE J. MACKEY, JOHN CHANDLER and LAWRENCE S. GRAUMAN for appellant.

CRAWFORD, MIDDLETON, MILNER & SEELBACH, CHAS. W. MILNER, GEO. W. NORTON, JR., and HUBERT WILLIS for appellee.

HENRY M. JOHNSON, amicus curiæ.

468

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant by statement filed in the Jefferson county court sought to have that court re-assess the franchise value of appellee's properties for the years 1927 to 1933, inclusive, praying that:

"All improper deductions and allowances in the assessment of defendant's property in each of the years made by the Tax Commission as the result of fraud, misrepresentation, and concealment upon the part of the defendant, and such as resulted from miscalculation and the application of wrong methods upon the part of the Commission, be treated as omitted property, * * * and be now assessed against defendant."

That court refused to re-assess, as did the circuit court to which appeal was taken, and from judgment of the latter court appeal comes to this court.

Applicable sections of Kentucky Statutes, 1936 Edition, are: Sections 4051, 4260-1 et seq., 4077, 4078a, 4114i-10 to 4114i-12, all of which (save 4051) relate in some measure to the method and manner of proceedings by a revenue agent to assess omitted property, and define the duties and powers of the courts in respect to the assessment of omitted property. These duties and powers have been pointed out in opinions by this court. Stearns Coal & Lumber Company v. Commonwealth, 167 Ky. 51, 179 S. W. 1080; City of Covington v. Shinkle, 175 Ky. 530, 194 S. W. 766.

It may be doubted, in the light of the pleadings as presented in the courts below, and decisions of this court, that the procedure begun and followed was wholly befitting in the case there and here presented. Conceding, however, for the purpose of this case, that there may appear elements which would give the courts below jurisdiction of some subject matter, we shall pass to the merits of the case.

We are assured by appellant that the "gravamen of the action is fraud by which the appellee obtained grossly, inadequate and illegal assessments in each of the years named." Appellant quotes Section 4051 of the Statutes, a penalizing statute, directed toward taxpayers who willfully make false statements, evading investments, convert taxable into non-taxable property, or

resort to any device for the purpose of evading taxation. The penalty provided is a fine and the suffering of triple taxation. Counsel argues that every provision of the section, supra, has been violated by appellee. If it relied on the provision of this statute, the suit below was improperly begun and prosecuted. We take it, however, that appellant treated the provisions of this section as the dividing line mentioned by Justice Holmes in Bullen v. Wisconsin, 240 U. S. 625, 36 S. Ct. 473, 60 L. Ed. 830.

The initial fraudulent activity charged is the alleged segregation of the company's business, by incorporating different departments thereof into separate units, one, the Kentucky Coke Company, an industrial corporation, which under the law is not required to pay a franchise tax. Subsequently these various corporations were resolved into a group of affiliates, controlled by the same holding company under one direction.

It is charged that these arrangements resulted in a diversion of income by means of "inter-company contracts," whereby the greater portion of appellee's earnings were transferred to the non-franchise paying company, causing a suspension of common stock dividends, and allowing large dividends in the name of the non-franchise paying corporation.

Fraud was charged, in that the appellee made false statements of expenses and net income, by reporting each year a greater amount of depreciation than was set up on the company's books. Fraud in reporting (or not reporting) the value of its common stock, and in reporting that it had not paid cash dividends on its common stock during the respective years. Added to these charges is the contention that the commission in assessing adopted an incorrect method, thereby reaching erroneous results.

The Louisville Gas & Electric Company of Delaware is a holding company; the Kentucky Coke Company (called by appellant the "dummy") is a producing company and subsidiary of the holding company, as are the Ivyton Oil & Gas Company (Delaware) a producing company, and the Kentucky Pipe Line Company (Ind.) a producing company. There are also the Kentucky Pipe Line Company of Kentucky, a gas transportation company; the Louisville Hydro-Electric Company, an electric producing company, the Madison Light and Power Company, an operating company, and the Ohio

Valley Transmission Company, an electric transmission company.

It is charged that upon the breaking up of the company into the various units there was executed inter-company agreements between the company and affiliates, whereby compensation for services to be rendered by each was so fixed as to screen the net income of appellee and its affiliates actually engaged in public utility business required to report, and center largely the profits of business in the non-franchise corporation, the Coke Company.

That under these inter-company contracts appellee, for fixed rentals, leased its generating plants and mines to the Coke Company, and agreed for the latter to manufacture in the company's plant electrical current to be sold to the appellee, at exorbitant prices, so as to permit huge profits for the Coke Company, and correspondingly reduce the earnings of the appellee. This arrangement was later extended to include the gas plants of appellee. The company in 1923 constructed a modern gas plant, which was later conveyed to the Coke Company, charging costs to the latter through its inter-company accounts. These contracts were renewed from time to time, appellant says, at exorbitant figures.

In 1928 the Louisville Hydro-Electric Company, an affiliate, completed its Louisville plant and began to furnish the bulk of electrical current to the appellee. This served to reduce the Coke Company's quantity of supply. It is alleged that the Hydro plant was out of commission during high river tides, but that the Louisville Company continued the service, for which it is charged it paid exorbitant prices to its affiliates. That in addition to the regular annual service, that is, generated current, the appellee agreed to and did pay the Coke Company approximately one and three-quarter million dollars for what was called the "stand-by service." The specific charge here is that the rental was in fact a bonus to the Coke Company, made for the fraudulent purpose of diverting the earnings to the non-franchise company, "all of which was paid by the Coke Company to the Delaware Company in the form of dividends."

This briefly described general plan of operation was carried on until 1933, at which time the Coke Company was dissolved and its property taken over by the appellee. It is charged that during the years involved the

Coke Company was incorporated for the purpose of evading taxation under the net earning plan or method, and to enable the company to depress the value of its stock, thus avoiding taxation under the "stock and bond plan."

We have not gone more into detail as to the matters above stated, particularly for the reason that the briefs and the testimony adduced by appellant fail to point out wherein the method adopted by appellee in carrying on its business during the years in question was done for the purpose of evading taxation, as appellant had the burden of showing.

The evidence to which we have been pointed as bearing on evasion seems to be contained in an answer to a question propounded to an officer and attorney having general supervision of the various corporations, while testifying before the Federal Trade Commission in 1931. The question was in substance:

"Why is it that the Louisville Gas and Electric Company of Kentucky does not operate the Waterside Station which it owns, instead of having it operated by another company, making payments to that company for current and stand-by service, and having that company make payments of dividends for rental to the holding company?"

In part the answer was:

"The Louisville Utilities, in order to conserve their net earnings, transferred a part of their properties, in this instance the producing and generating equipment, under lease to the Coke Company, a non-franchise corporation, not subject to the payment of a franchise tax. By so transferring the net earnings of the company to an industrial company the franchise tax which the remaining property paid was materially reduced."

Taking this excerpt from the witness' statements as being true, it would hardly be considered as sufficient evidence that the plans and methods adopted and carried out by the corporation were fraudulent. The sole charge is that by these things having been done, the company evaded taxation upon a part of its taxable values. It has been held by the U. S. Supreme Court that a taxpayer has the right to reduce his taxes if the method be legal; in fact, it may avoid them altogether,

if it be done in a manner which the law permits. Bullen v. Wisconsin, supra, United States v. Isham, 17 Wall. 496, 21 L. Ed. 728; Superior Oil Company v. Miss., 280 U. S. 390, 50 S. Ct. 169, 74 L. Ed. 507. See, also, Jones v. Helvering, 63 App. D. C. 204, 71 F. (2d) 214; Section 4051, Kentucky Statutes.

Under Section 4051, in order to visit the penalties, a statement for the purpose denounced must have been willfully made, and it may be assumed that the resort to any device for the purpose, must have been willful. This would necessarily lead to a conclusion that where the basis of the charge is fraud, it must be established as in any other fraud case to the satisfaction of the courts, the challenger carrying the burden.

As we read the testimony, the conclusion cannot be escaped that it was shown that while the Coke Company was making a high rate of return on its investment, standing alone, that for the purposes of public utility regulations (and taxation) all the properties used in rendering public service should be taken as a unit. Furthermore, it is clearly demonstrated by the proof that the appellee and Kentucky Coke Company, for purposes of franchise assessment, made consolidated returns, which plan is not objectionable. Commonwealth v. Southern R. Co., 193 Ky. 474, 237 S. W. 11; Southern R. Co. v. Com. of Kentucky, 274 U. S. 76, 47 S. Ct. 542, 71 L. Ed. 934; Old Mission Portland Cement Company v. Helvering, 293 U. S. 289, 55 S. Ct. 158, 79 L. Ed. 367.

Consolidated returns were made, and property divulged and it cannot be said the method adopted by appellee was carried out for the purpose of evading assessment or ultimate taxation, even though the intercompany contracts were omitted, since there was, as shown by proof of commission members, sufficient data to reach the correct net income.

We come now to the ground of alleged fraud because the net income reported by appellee each year was less than shown by the books of the company. As an example, in 1926 after deducting admittedly non-taxable (inter-state) business, and non-operating income, appellee's net income in Kentucky was $2,995,712.87. In its report for that year this item under the head of "Net Earnings" was $1,587,088.37.

It is argued that the disparity between the net earn-

ings shown on appellee's books, and reported for assessment purposes, indicate a perpetrated fraud. The same is said with respect to the disparity between actual (book) and reported net income distribution, and as to expenses and depreciation for each year, and these discrepancies are admitted by appellee. The items mentioned do show wide disparity and in the absence of explanation would appear irreconcilable but there is no claim that all these facts and figures were not before the assessing board and the two courts which heard the case on its merits.

Appellant concedes that the gross income of appellee was correctly reported each and every year. The discrepancies above quoted, while not entering into the item gross income, have a bearing on net income and its distribution. It appears in the testimony that it is a practice of utility corporations to set up on their books a lesser depreciation than is reported. It may be conceived that the one may be for establishment and maintenance of credit; the other an endeavor to induce, not necessarily to mislead, the tax commission in giving as high a depreciation as it may on hearing of such proof as the commission may require. It is not unreasonable for the books to show a larger net income than is shown on reports, the difference being due to the fact that a larger undetermined depreciation is set up in report than on books.

In this case, if it could be concluded from the testimony that such alleged ''manipulation'' of items was done for the purpose of committing a fraud, and actually deceived the assessing authority, there would be merit in appellant's contention if properly based, but it is difficult to believe that the commission with appellee's books accessible, and the reports before it, could have been deceived. The same assumption would apply to the courts.

As we read the testimony it is clear that the item ''depreciation'' was considered by the taxing authorities. It was of considerable importance in reaching a correct valuation. This item is not one static. It is an item to be ascertained and deducted in amount necessary to replace property worn out, or to restore impaired property, so as to maintain it continuously, and as nearly as practicable at the same level of efficiency for service. The amount set aside periodically for this

purpose is the so-called "depreciation allowance." United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390; City of Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371.

Before ascertaining net income as a basis for assessment, the corporation is entitled to a deduction for what the board finds to be reasonable depreciation. The amount set-up on the books, or in the report, is not binding on the board. Appellant in brief conceded that "this (allowance of reasonable depreciation) is not an arbitrary power governed by any fixed rule or formula, nor is it controlled by the depreciation fixed by the taxpayer in its business."

It is shown in the proof that in each year involved, the appellee reported depreciation, and showed other expenses in a detailed manner. A member of the board said that the amount of depreciation for each item of the company's property was fully set out and presented to and considered by the board in each of the years. That the board did not accept the reports of the appellee as to items of expenses, depreciation, etc., is evidenced by the fact that in each year these were from one-half to three-quarters of a million dollars less than amounts reported, and, of course, greater than as shown on the books.

What is said above as to the items of expense and depreciation applies to the matter of valuation of the capital stock of the company, at least to the point that all information desired, requested or required by the board was before it; most assuredly, in an amplified way, before the courts which had the matter under consideration.

As to the stock value, the claim of fraud is based on the charge that the company reported that its stock did not have the value which appellant contends it actually had. The proof is that during the years involved, and others antecedent, there was no sale of or trading in its stock, hence no report of sales to which the board could resort for the purpose of estimating its market value. In this state of case the board had the right to ascertain the value of appellee's franchise by the capitalization of the net income plan. Bosworth v. Highlands Railway Company, 183 Ky. 749, 210 S. W. 671; Commonwealth v. Kottmyer, 183 Ky. 163, 208 S. W. 823;

Chesapeake & Ohio R. Co. v. Commonwealth, 190 Ky. 552, 228 S. W. 15.

The company reported the par value of the common stock issued and outstanding at approximately $12,-000,000, and gave its "estimate" of the value at $200,000. The record shows that the board did not accept the "estimated value," but valued it at $5,000,000. It is shown that while the member of the board who had appellee's reports for franchise valuation, adopted the net earning plan, another member of the board checked the plan adopted by the stock and bond plan. He was asked what evidence of the value of the stock he had in reaching his conclusion as to the value thereof. He replied:

"Well, that is always where the trouble comes in. I suppose the other commissioners and myself disagreed. They said I had no evidence. But when you allow enough depreciation there to capitalize the figure we fixed it at on a net income plan, there is something left after paying the preferred and bond interest to apply to the common stock, which would make the common stock worth somewhere between twenty-five and fifty cents."

This conclusion as to the value of the stock as above recited would not leave a wide margin between the stock value as fixed, and the value suggested by Judge Lewis.

We gather from the record that appellee correctly reported its gross income, and furnished in its report or upon request all the information necessary to enable the Commission to determine fairly the entire value of the company's tangible property and franchise; and that it reported in detail, sufficiently for the board's purpose, all items deductible from gross earnings in order to arrive at the amount of the net earnings; the par and market value of the bonds and preferred stocks and the interest and dividends paid on the bonds and preferred stocks.

With this information before it the Commission was able to value the common stock by means of the net income available therefor, according to the view of two members.

It is charged that there was fraud perpetrated by the appellee's reporting that it had paid no dividends on its common stock. It appears that in the report re-

quired under the statute, question No. 23 demands: "Give the amount of cash dividends declared within the year," and to which question appellee answered for each year: "None." Appellant insists this was fraud.

We need not go to great length on the question of whether or not the appellee was required by this inquiry to state what dividends were otherwise paid, if any, in answer to the above question. Appellee shows, and demonstrated to the board, that it neither declared nor paid cash dividends. The amount available for distribution was ascertainable, and ascertained by the commission from reports and other information furnished. The distribution of earnings, after deductions, whether called dividends or payments of obligations, as we gather, was a book transaction. For instance, the Coke Company at stated intervals would debit its profit and loss account with a certain sum and credit the same amount to appellee, the stockholder, which in turn would charge it on its books in open account against the Coke Company, and credit its profit and loss account with a like sum. The accounts of all the so-called inter-companies under contract were cleared through the Louisville Gas & Electric Company. These transactions were known to the board and were before the lower courts. The board had before it each year facts and figures in the way of reports from which it could, and did, ascertain the net income or earnings. Appellee, as has been shown, reported each year its claimed deductible expenses and depreciation. In view of this showing it would make no difference in reaching final assessment, whether the dividends were paid in cash, or under the method adopted. The distribution by dividend declared and paid in cash, or in the manner set out, would be necessarily a showing of the assets of all the companies.

The fact that there was no accounting for dividends as such would apparently make no difference in final results. It is insisted by appellant that the board used the combined method of assessment. That is, by first using the stock and bond plan (or vice versa) and then the net earning plan, combining the result and striking an average valuation. As we read the record we are convinced that the board applied the net earning plan in every year, perhaps, except two. However this may be, the testimony shows that the members of the board were of one mind, one more emphatic perhaps than the other,

in the assertion that if the board had no knowledge of the open account transactions, it would have made no difference in arriving at the value of the franchise in each year. The question was whether or not, if the holding company was receiving approximately one and one-half million dollars in each year, such information would have been of aid. One board member answered: "Not a bit in the world," and his explanation showed that the method was the net earning plan. The other member being propounded the same question, and he was wedded to the stock and bond plan, answered, "I doubt if it would."

One member in answer to a question as to the method that valuation was reached said: "By first placing the proper value on their tangible property and then figuring their earnings or their net income as finally passed upon by the Commission."

Asked if they took into consideration the value of stocks and bonds, the answer was:

"Wherever the actual value of the stock plan could be obtained * * * and we found by figuring that stock would capitalize higher than the net income, we used both plans, then averaged the stock and bonds and earnings value," but witness added:

"I used the Louisville Gas & Electric Company upon the earning basis. Judge Lewis would follow that by checking my figures upon the stock and bond plan to see whether or not anything could be gained by assessing it both ways. I found in 1930 and 31, is my recollection, the company would figure more on the actual tangible value than it would upon an average plan between stocks and bonds and earnings."

Judge Lewis said: "Where we could, we stuck more to the net earning plan; I believe we adhered more to the net earning plan."

Both witnesses were testifying as to assessment of the company, and indicated that the same method was applied to all utility companies.

Our statute, Sections 4078-4079, provides that the assessing authority from statement or report "and such other evidence as it may have * * * shall fix the value of the capital stock of" the taxpayer, and from the amount found deduct the assessed value of tangible

property. The method by which the "capital stock" is fixed, is by "capitalizing the net income derived in this state." Section 4080.

In the case of Cumberland Pipe Line Company v. Lewis, D. C., 17 F. (2d) 167, the court, after concluding that the market value of stocks (or bonds) was the proper criterion (in that case) on which to base the value of capital stock, in differentiating the Pipe Line Case from two cases to which the court referred, and speaking of the Commission's acts, said [page 168]:

> "Defendants would have it that such was the only method which the commission was entitled to pursue. This position is based on the decisions of the Kentucky Court of Appeals in the cases of Commonwealth v. Kottmyer, 183 Ky. 163, 208 S. W. 823, and Bosworth v. Kentucky Highlands Railroad Company, 183 Ky. 749, 210 S. W. 671. In each of those cases the capitalization of net income method was pursued. But this was so because it so happened that this was the only method applicable thereto. The Kottmyer Case involved the assessment of a ferry franchise owned by an individual. The Kentucky Highlands R. R. Co. Case involved the assessment of a franchise of a railroad corporation, which operated 6.46 miles of railroad. It is not unlikely that its entire issue of stock and bonds, was held and owned by the Louisville & Nashville Railroad Company. At any rate, there is no indication that they had any market value to which an appeal could be made in fixing the value of the corporation's capital stock * * *"

In the case of Chesapeake & Ohio Railway Company v. Commonwealth, 190 Ky. 552, 228 S. W. 15, we said, as we had held in other cases [page 16]:

> "The Board is vested with a large discretion in determining the value of the franchise. Several methods have been adopted in so fixing it; e. g., the stock and bond method, addition of the surplus to capital, or the capitalization of the net income. It may adopt any of these, or indeed the several processes may be combined." Hager v. American Surety Company, 121 Ky. 791, 90 S. W. 550, 28 Ky. Law Rep. 782.

Appellant insists that the language quoted above is

dicta, and that the conclusion was criticized, in fact overruled, in the opinion by Judge Cochran for the three judge court, in the Pipe Line Case. A reading of that opinion does not justify the conclusion that the ruling of this court on the question of adaptable methods was overruled. The federal court found that there was no evidence that the taxing body had ever availed itself of the "book method," but that the board had at times used the stock and bond plan, and in other instances had used the net capitalization plan, which is frequently the only method apart from the book value method which can be appealed to. The court pointed to Louisville & Nashville Railroad v. Greene, 244 U. S. 522, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97, wherein the court said [page 691]: "* * * there are (at least) two recognized methods, known as the stock-and-bond plan and capitalization-of-income plan."

The court in the Pipe Line Case found that it was not true that the commission in fixing the value of the plaintiff's capital stock was "shut up" to the capitalization of the net income method, as a matter of law or fact. It indicated that the latter plan was a well-recognized method, but that while plaintiff had no outstanding bonds, it did have "outstanding stock which had a market value. * * * These shares of stock have for years been dealt in regularly on the New York Curb Exchange." The court remarked that the stock and bond plan had been recognized in both this court and in the U. S. Supreme Court, and concluded that it should have been applied in the case there under consideration, not because exclusive, or that it condemned the capitalization method, but because the latter plan was erroneously applied in that case, under the particular facts therein disclosed, for reasons very explicitly set out in the opinion. We can see no reason, based on the Pipe Line Case, for holding that the board in the instant case had no discretion; in fact it appears from the proof that the commission was relegated to the adoption of the plan used.

Not a great deal is said by appellant as to the realization of great profit on the part of the engineering and management company. The charge is that under the contracts by which the appellee practically turned over the supervision and engineering of its subsidiaries to the engineering and management company, unconscionable amounts were paid, thereby diverting earnings which

should be charged back to appellee's net earnings and capitalized.

We need not discuss this feature further than to say that these charges were based on contracts which are not attacked on grounds of illegality. All the facts in connection therewith were before the board and the courts below. There is no showing that the board acted collusively, or without sufficient data in allowing these deductions. Undoubtedly, "They discharged the duty devolved upon them by the statute as best they could, and, if they erred in judgment, that is no reason why the court should award a mandamus requiring them to meet again and make an assessment of the franchise." Chesapeake & O. Railway Company v. Com., supra, and cases cited.

It would carry this opinion to a great length if we undertook to answer other objections and contentions made. It may be observed here that they have all been considered by the court, and while not classifying them as being of no importance, we are in a position to say that they appear to us to be minor to the questions discussed above, and our conclusion as to such may be embodied in our general conclusion, which may be stated (adopting, but paraphrasing the language used in similar cases) in short:

Where it is sought by an officer of the state or county to assess omitted property, the one seeking the reassessment must show to the satisfaction of the court that property has been omitted, and when this is accomplished, the burden is on the taxpayer to show by clear evidence that, notwithstanding the alleged omission, if it be shown, that the board in making the assessment considered, fixed and assessed the value of the omitted property from information before it. Chesapeake & O. R. Co. v. Commonwealth, supra.

We think that here the appellant failed to show any omission of assessable property; that appellee met the burden imposed upon it of divulging its properties; that the commission, and certainly the lower courts, had before them, or had access to all data necessary to acquaint those bodies with the conduct of appellee's business.

There are matters discussed in the brief claimed to have some bearing on the question of alleged fraud, as, for instance, reference to appellee's assessments for

subsequent years by a succeeding taxing board. These matters were not, nor could they have been, before or considered by the assessing board, nor the court below. Nevertheless, we have considered them carefully and do not find that they are of sufficient weight to induce the belief that the assessment complained of was fraudulent, or as supporting the other charges set forth in complaint and argued in the briefs.

We have, therefore, concluded that the evidence establishes the fact that the commission had before it all the information necessary upon which to have a correct valuation of appellee's property, and that upon this information it acted well within the scope of its authority, and if in the exercise of its judgment there is any error on the part of the commission it is one of judgment or discretion which we are powerless to correct, hence the finding of the Commission was final.

Judgment affirmed.

Whole court sitting, except Judges Cammack and Fulton.